No. 06-15-00075-CV

FILED IN
6th COURT OF APPEALS
TEXARKANA, TEXAS
11/9/2015 9:11:00 AM
DEBBIE AUTREY
Clerk

IN THE COURT OF APPEALS

FOR THE SIXTH DISTRICT OF TEXAS

at TEXARKANA

GARY DAVID BRAY, et al.,

v.

GREGORY L. FENVES

Appealed from the 53rd District Court of
Travis County, Texas

_____

## APPENDIX TO APPELLANTS' BRIEF

_____

Kirk David Lyons
Texas Bar No. 12743500
Southern Legal Resource Center, Inc.
P.O. Box 1235
Black Mountain, N.C.  28711
Tel.  (828) 669-5189
Fax  (828) 669-5191
kdl@slrc-csa.org

ATTORNEY FOR APPELLANTS

# APPENDIX

Order Denying Plaintiff's Application for
Temporary Injunction ..................................................TAB A

Order Granting Plea to Jurisdiction...........................TAB B

Littlefield Will ...........................................................TAB C

Monument Protection Act, Texas Government
Code Sections 2166.501 and 2166.5011 ...................... TAB D

University of Texas System Board of Regents Rules
138 § 2 and 60101 § 2..................................................TAB E

# TAB A



CAUSE NO. D-1-GN-15-003330

| | | |
|---|---|---|
| GARY DAVID BRAY, and TEXAS DIVISION, SONS OF CONFEDERATE VETERANS INC., and DAVID STEVEN LITTLEFIELD<br>  Plaintiffs,<br><br>V.<br><br>GREGORY L. FENVES, in his capacity as President of the University of Texas at Austin,<br>  Defendant. | § § § § § § § § § § § § § § | IN THE DISTRICT COURT<br><br><br>OF TRAVIS COUNTY, TEXAS<br><br><br><br><br>53rd JUDICIAL DISTRICT |

## ORDER DENYING PLAINTIFF'S APPLICATION FOR TEMPORARY INJUNCTION

On August 27, 2015, the Court considered Plaintiffs' Application for Temporary Injunction in the above-styled and captioned cause. Plaintiffs appeared in person and were represented by their attorney of record, Kirk D. Lyons, and announced ready. Defendant appeared through his attorneys of record, Susan Marie Watson and Mariel Puryear, and announced ready. The record of testimony was duly reported by Della Rothermel, the court reporter for the 250th Judicial District Court.

After considering Plaintiffs' Application, Defendant's Response brief, the arguments of counsel, the evidence presented, the pleadings on file, and all other relevant factors, the Court is of the opinion that Plaintiff's Application for Temporary Injunction should be and is hereby DENIED in all respects. IT IS THEREFORE ORDERED that Plaintiff's Application for Temporary Injunction is DENIED.

SIGNED this 28th day of August 2015.

JUDGE PRESIDING

TAB B



CAUSE NO. D-1-GN-15-003330

GARY DAVID BRAY, and TEXAS      §      IN THE DISTRICT COURT
DIVISION, SONS OF CONFEDERATE      §
VETERANS INC., and DAVID STEVEN      §
LITTLEFIELD      §
         Plaintiffs,      §      OF TRAVIS COUNTY, TEXAS
     §
V.      §
     §
GREGORY L. FENVES, in his capacity as      §
President of the University of Texas at      §
Austin,      §
         Defendant.      §
     §      53rd JUDICIAL DISTRICT

## ORDER GRANTING PLEA TO JURISDICTION

On August 27, 2015, the Court considered Defendant's Plea to the Jurisdiction in the above-styled and captioned cause. Plaintiffs appeared in person and were represented by their attorney of record, Kirk D. Lyons, and announced ready. Defendant appeared through his attorneys of record, Susan Marie Watson and Mariel Puryear, and announced ready. The record of testimony was duly reported by Della Rothermel, the court reporter for the 250th Judicial District Court.

After considering Defendant's Plea to the Jurisdiction, Plaintiffs' Response brief, the arguments of counsel, the evidence presented, the pleadings on file, and all other relevant factors, the Court is of the opinion that Defendant's Plea to the Jurisdiction should be and is hereby GRANTED in all respects. IT IS THEREFORE ORDERED that Defendant's Plea to the Jurisdiction is GRANTED and Plaintiffs' claims against Defendant are hereby dismissed with prejudice to refiling of the same.

SIGNED this 31st day of August 2015.

_____
JUDGE PRESIDING

TAB C

PL. Ex A



**OFFICE OF THE VICE PRESIDENT AND CHIEF FINANCIAL OFFICER**
THE UNIVERSITY OF TEXAS AT AUSTIN

*P.O. Box 8179 · Austin, Texas 78713-8179 · 512-471-1422 · FAX 512-471-7742*

July 24, 2015

<u>VIA E-MAIL</u>

RE:    OPEN RECORDS REQUEST – George W. Littlefield Bequest

Dear Requestor:

This is in final response to your Open Records Request submitted to The University of Texas at Austin via email on July 13, 2015. You requested that The University provide you with copies of documents pertaining to the institution of the George W. Littlefield bequest. Specifically requested were documents and agreements pertaining to the monuments and markers placed on the UT Austin campus and any stipulations around the position of monuments on campus, their care, maintenance and display.

Enclosed please find the information you requested. You may contact Ms. Annela Lopez directly at (512) 471-8300 if you require any further assistance.

Sincerely,

Margo Iwanski
Assistant to the Vice President

MI:blw
Enclosure

Laura -FYI
Dawn onian

Probate # 5220.                          IN THE COUNTY COURT OF TRAVIS COUNTY,
THE ESTATE OF GEORGE W.                  TEXAS, IN PROBATE, JANUARY TERM, 1921.
LITTLEFIELD, DECEASED.

APPLICATION. Filed Nov. 20, 1920. Rec. Vol. 45, page 117.
Now come your petitioners H. A. Wroe, who resides in Travis County,
Texas, Whitfield Harral, who resides in Dallas County, Texas, and J. P.
White, who resides in Chaves County, New Mexico, and respectfully
represents to the Court that George W. Littlefield is dead; that he
died on or about the 10th day of November, 1920, at Austin, in the
County of Travis, and State of Texas; that said deceased at the time
of his death was a resident of the County of Travis, and in the State
of Texas.    That at the time of his death the said George W. Little-
field was seized and possessed of real and personal property of the
probable value of $2,000,000.00 and left a written will, duly executed
consisting of an original will and a first and second codicil thereto,
each of which are herewith filed, in which your petitioners were ap-
pointed joint executors.    That your petitioners nor either of them,
are not disqualified by law from accepting letters testamentary.
Wherefore your petitioners pray the Court that citation be issued to
all parties interested in said estate as required by law, that said
will be admitted to probate, that letters testamentary be issued to
your petitioners and that such other and further orders be made as to
the Court may seem proper.
NOTICE OF APPLICATION.    Issued Nov. 20, 1920. Rec. Prob. Min. Vol.
45, pages 118-119.    Returned showing posting at three public places
in county, one of which was at Court House door, etc.    Citation is-
sued same day, recorded same book and page, returned showing publica-
tion Nov. 22 & 29, and Dec. 6, 13, 20 & 27 in Austin Statesman; as
also shown by Affdt. of Althea Jones, Agt. made Dec. 29, 1920.
WILL OF GEORGE W. LITTLEFIELD. Filed Nov. 20, 1920. Rec. Prob. Min.
Vol.  45, pages 87 et seq.
THE STATE OF TEXAS )
COUNTY OF TRAVIS    )    KNOW ALL MEN BY THESE PRESENTS:
    That I, GEORGE W. LITTLEFIELD of the County of Travis and State
of Texas, being of sound and disposing mind and memory, do make and
publish this my last will and testament, hereby revoking all wills
by me at any time heretofore made, it being my wish, however, that
should this will for any reason fail to take effect, the will written
by me on the 17th day of February, 1912 shall take effect and be car-
ried out as my will, and in the event both this will and the one dated
February 17th, 1912, should for any reason fail to take effect, that
the will executed by me on the 20th day of April, 1911 shall take ef-
fect and be carried out as my will, that is, that the revocation of
said wills heretofore executed shall be conditional upon this will be-
ing probated.  By the use of the words "fail to take effect" I do not
mean a partial failure.
1.    I direct that all my just debts shall be paid as soon after my

                           (Continued)

FED. LAND BANK

death as practicable.

2.    I direct my executors hereinafter named to pay to my brother, William P. Littlefield of Kenna, New Mexico, the sum of one thousand dollars ($1000.00) on the first day of January of each year and a like sum on the first day of July, of each year after my death, such payments to continue during his natural life.    These payments shall not be subject to, nor be anticipated by, any kind of previous transfer or order nor to any debt or demand against my said brother, and the money shall be paid to him in person in cash if necessary to insure his receiving the benefit thereof.    I also give, devise and bequeath to my said brother all the cattle belonging to me on his ranch at the time of my death and release him from all debts he may owe me, and direct my executors to give him full release therefrom.    I further give and devise to said William P. Littlefield all the land that has heretofore been deeded to me and now used by him as a ranch, and direct my executors to execute and deliver to him a sufficient deed conveying said land to him by proper description.

3.    I direct my executors to pay Mrs. M. M. Harral of Gonzales, Texas, the sum of twelve hundred and fifty dollars ($1250.00) on the first day of January of each year and a like amount on the first day of July of each year such payments to continue during her natural life. I owe said Mrs. Harral several vendors lien notes given by me in part payment for a farm purchased from her.    I desire that my executors pay these notes as they mature.

4.    I direct my executors to pay to my old war servant, Nathan Littlefield Stokes, the sum of two dollars each Saturday night during his natural life; also to provide him with a home in which to live either by permitting him to use some property belonging to my estate or by renting a suitable home for him and paying the rent out of the property of my estate; also to permit him to collect the rent after my death and during his natural life from the cottage and lot on 25th Street in the City of Austin, Texas, described as West 1/2 of Lot Number 12 in block number 8 Whitis Addition it being my intention to give and devise to said Nathan Littlefield Stokes the use, enjoyment and revenues of said cottage and lot during his natural life, same to revert to my estate after his death.    I also direct my executors to see that all necessary living and medical expenses of said Nathan Littlefield Stokes are paid out of my estate should the said weekly payment and rentals of said cottage not be sufficient.    When he dies, I desire that he be buried on my cemetery lot, and a suitable headstone erected over his grave, all expenses thereof and of burial to be paid for by my executors.

5.    I give and bequeath to a board of trustees to be composed of H. A. Wice, of Austin, Texas and those persons who occupy the positions of President of the University of Texas, Librarian of the State of Texas, Librarian of the University of Texas and Professor of History in the University of Texas as trustees the sum of one hundred thousand dollars, this sum to be added to the fund heretofore given by me

(continued)

Probate #5220.                     -3-

for the purpose of preparation of a History of the United States, and
the entire sum to be used and expended, so far as is deemed necessary
or desirable by said board of trustees in the preparation and publi-
cation of a History of the United States with the plain facts concern-
ing the South and Her acts since the foundation of the Government, es-
pecially since 1860, fairly stated in order that the children of the
south may be truthfully taught and persons maturing since 1860 may be
given the opportunity to inform themselves correctly concerning the
south and especially of the Southern Confederacy.   It is my desire
that the said board shall publish and sell said history on such terms
and for such price as the majority may deem best, and that proceeds
of such sales and such portion of the said money as may remain shall
be invested by said board in income bearing property, and the income
used to establish and maintain a chair of American History in the
University of Texas.   The said board shall be composed of the persons
who occupy said positions and as each vacates his office, his success-
or shall take his place on said board.   Should the position of H. A.
Wroe become vacant, same shall be filled by vote of a majority of the
remaining trustees.   Said board shall have full authority to invest
all or any part of said sum, to collect and receipt for same, and re-
invest same as in their discretion seems best, and in general is given
full authority to do all things reasonably necessary or desirable to
carry out the purpose of this gift, including such dominion over any
property belonging to said trust as I could exercise if living and not
inconsistent with the purpose of this gift.

6.     I give and direct my executors hereinafter named to pay to Will
C. Hogg of Houston, Texas, H. A. Wroe, of Austin, Texas, and the per-
son who occupies the position of President of the University of Texas
as trustees the sum of two hundred thousand dollars ($200,000.00) said
committee to use said sum or so much thereof as may be necessary to
erect a massive bronze arch over the south entrance to the campus of
the University of Texas, in Austin, Texas.   On the top of the arch
I wish them to place a life size statue of Jefferson Davis, the Pres-
ident of the Southern Confederacy, to his right and below him I wish
them to place a life size statue of General Robert E. Lee, Commander
of the Army of Virginia, to the left of President Davis and below him
and opposite the statue of General Lee, I wish them to place a life
size statue of General Albert Sidney Johnston, Commander of the Army
of Tennessee.   Under General Lee I wish them to place a statue of
John H. Reagan, Postmaster General of the Confederacy, and below the
statue of General Johnston a statue of James S. Hogg, the peoples'
governor of Texas.   The space in the center between the two drive-
ways can be filled as the committee deems best.   I desire the arch
lettered as follows: under the statue of Jefferson Davis, the follow-
ing: "President of the Confederate States of America"; under the

(continued)

67

statue of General Lee, "Commander of the Army of Virginia"; under the statue of General Johnston "Commander of the Army of Tennessee"; under the statue of Mr. Reagan: "Postmaster General of the Confederacy"; under the statue of Governor Hogg: "The Peoples' Governor of Texas" and at some prominent place the following "This arch built and donated to the University of Texas by George W. Littlefield". The arrangement given here is suggested to the committee as being the best; however, they are authorized to change it or the design suggested if they wish, giving prominence however to the statues of the men named above. I believe the work of constructing said arch should not begin earlier than three years after the termination of the present war with Germany unless prices of material are reduced to a fair level prior to that time. This is left, however, to the discretion of the committee herein appointed to construct said arch, they being authorized if they deem best, to commence work of construction at any time. Any excess of money over the amount used to construct such arch shall be returned to my executors and the body of my estate.

7. I give and direct my executors to pay to the persons who are President of the University of Texas, the person who is the member of the Building Committee of the Regents of said University residing in Austin, and H. A. Wroe of Austin, Texas, as trustees the sum of two hundred and fifty thousand dollars ($250,000.00) same to be expended in the construction of a girls' dormitory on lots one (1) and two (2) in Block 3 Whitis Addition to the City of Austin, Texas, being the lots owned by me immediately east of my present home, said building to be of first class finish and construction. The said lots and building shall be donated and conveyed to the University of Texas by my executors as a memorial to my wife, Mrs. Alice P. Littlefield, and it shall be known as the Alice Littlefield dormitory. I believe that work of construction of said dormitory should not begin earlier than two years after the termination of the present war with Germany unless prices of material are reduced to a fair level prior to that time. This is left, however, to the discretion of the committee herein appointed to construct said building, they being authorized if they deem best to commence work at any time. If any part of said sum remain after completion of said building, same may be expended for furnishing same. It is my intention to devise said lots to said University with building thereon as aforesaid, subject to reversion as herein provided for, such intention to be effectuated as herein set forth. This dormitory is to be used to accommodate the Freshman class of Young Women entering the University as they need assistance and protection more than girls who have been in University before them. Girls of other classes may be given accommodations, but those of the Freshman class shall have preference until all desiring rooms have them. After said building is completed said trustees shall execute and deliver to the Board of Regents of the University of Texas a deed conveying

(continued).

said lots and improvements to the University of Texas or to the State of Texas for the use of the University such deed to provide that the property shall revert to my estate if the Main University shall within 21 years after my death be changed from its present location near my home in Austin, Texas. Such deed shall state that branches of the University may be established and maintained elsewhere and that if sufficient ground for construction of buildings cannot be secured in the present location, such ground may be secured or used elsewhere in Austin, Texas, but that the present campus or any available ground in the neighborhood thereof must be utilized so far as is consistent with the space available before any buildings for the Main University are constructed elsewhere on penalty of such reversion. If for any reason said lots cannot be used for said purpose, then it is my desire that my executors purchase with other funds of my estate suitable lots near my house, same to be used for construction of said dormitory.

8.    In case my wife, Alice P. Littlefield survives me, I direct that my executors as soon as convenient sell so much of my personal property as may be necessary to pay all my just debts, the sums herein provided for and retain ample property or money to make the annual and other payments hereinbefore provided for and all probable expenses. In such case, I give, devise and bequeath to my wife all the residue of my property, real, personal and mixed, In such case, it is my desire that my executors hereinafter named shall if agreeable to my wife act as her agents and manage the property belonging to her and operate her interest in the Yellow House Ranch, J. P. White of Roswell, New Mexico, to act as manager at the salary fixed in another portion of this will. It is also my wish that should it ever be necessary to have guardians of her person or estate appointed, that said J. P. White, H. A. Wroe of Austin, Texas, and Dr. Whitfield Harral of Dallas, Texas, be appointed as joint guardians of her person and estate or either as the case may be.

9.    I hereby appoint, designate and constitute H. A. Wroe of Austin, Texas, J. P. White of Roswell, New Mexico and Dr. Whitfield Harral of Dallas, Texas the sole executors of this my last will and testament, and I hereby provide that no action shall be had in the County Court or other Court of Probate in this or any other state in relation to the settlement or administration of my estate other than the probating of this will and the return of an inventory, appraisement and list of claims of my estate. I further direct that no bond or other security shall be required of my executors or any of them in such capacity. The above provisions as to bond and as to action of the probate court shall apply in full force to all trustees named herein and especially to those provisions of this will naming as Trustees the same persons who are herein named as executors. Such executors shall receive $3000.00 each per year as full compensation for their services, such payment to be in lieu of all compensation fee or commission provided by law.

(continued)

10.     I hereby give and grant to my said executors, when qualified, full and absolute dominion over property of my estate (including any and all community estate to which my wife might be entitled, but for the provisions of this my will) and they are hereby authorized according to their discretion, to manage, control and dispose of the same; sell, convey or encumber same, to borrow money all in the same manner that I could do if alive;

11.     In case my wife does survive me, this will shall take effect as if paragraphs numbered 5, 6 and 7, and 12 to 33 inclusive, had not been included herein.    In case she does not survive me, then all parts of this will save paragraph 8, shall take effect and constitute my will.

12.     If my wife shall not survive me, it is my desire that my executors shall as soon as practicable after my death convert all personal property belonging to my estate, or so much as may be necessary to pay legacies into cash, and with such cash, shall pay all legacies herein made.    Should this be insufficient to pay all legacies then it shall be apportioned to the various legatees and a portion of my land in Hockley and Lamb Counties, Texas shall be sold    at such time as the executors deem best so that sufficient money to make all such legacies may be realized.    Or if they deem best, all the additional sums needed for this purpose or any part thereof may be derived from the income of operation of my property as hereinafter provided for.

13.     I give, devise and bequeath to my nephew, J. W. White, of Mason, Texas, as trustee for Mrs. Hilda Hodges of Roswell, New Mexico, during her life time and for her son, Welborn Hodges, or his descendants, or my niece, Ida W. Walker or her descendants after her death my three fourths (3/4ths) interest in lots one and two in Block One in the City of San Angelo, Texas, according to the original plot of said city, together with all improvements thereon, said property being known as the Gibbs Block and being the property in which said J. W. White owns an undivided one fourth interest.    Said trustee shall have the full management and control of said interest in said property and shall pay the net income therefrom to said Mrs. Hodges during her life. The rights of said Mrs. Hilda Hodges shall be limited to the use, enjoyment, income and revenues during her natural life.    After the death of said Mrs. Hodges, said interest in said property shall pass in fee simple free from said trust and without limitation or remainder to her son Welborn Hodges, or if he be not living to his descendants, and if he shall have died and left no descendants who survive said Mrs. Hilda Hodges, then said interest shall pass to my niece Ida W. Walker, if living and if not to her descendants, and if she then be dead and have no surviving descendants, to her legal heirs.

14.     I give and bequeath to my nephew, Victor P. Harral of Gonzales, Texas, the sum of one hundred thousand dollars ($100000.00).    I

(continued)

further give, devise and bequeath to Dr. Whitfield Harral of Dallas, Texas, as trustee for Victor P. Harral during his natural life the farm of two hundred acres on which he now lives, being the farm I Purchased from Mrs. M. H. Harral, and the 115 acre farm I own on the Guadalupe River adjoining that farm and the 100 acres known as the Allen tract of land, all being part of the J. M. Salinas grant in Gonzales, County, Texas, and being all the land I own in said county except the 105 acre tract hereinafter referred to. It is my intention to limit the rights of said Victor P. Harral in said land to the use, enjoyment, income and revenues during his natural life, and that after his death all of said three tracts of land shall be sold by the said trustee at public or private sale on such terms and in such parcels as he may deem best and the proceeds of such sale after payment of expenses divided equally share and share alike between the widow of said Victor Harrall and his surviving children free from said trust. Provided, however, that if any child of said Victor P. Harral shall have died leaving a child or children that survives Victor P. Harral, such grandchild or grandchildren shall take such share of the proceeds of said property as their said deceased parent, being a child of said Victor Harral, would take if it were living. In case said Victor P. Harral shall not desire himself to cultivate said land, said trustee shall manage and control it, renting it or handling it as he deems best and the net income therefrom during the lifetime of said Harral shall be paid to him, it being distinctly provided that such net income shall not be subject to any debt or demand against the said Harral, nor be anticipated by any kind of previous transfer or order, and that same shall, if necessary to assure his getting the benefit thereof be paid to him in cash in person by said trustee. I also give and bequeath to said Dr. Whitfield Harral as trustee for said Victor P. Harral the 105 acre tract of land adjoining the farming property hereinabove described and known as the Caldwell or James Smith tract of land being in Gonzales County, Texas. Said tract shall be held and managed by said trustee as herein provided for three years after my death and then shall be sold for cash or credit at public or private sale and the proceeds delivered to said Victor P. Harral and to be his property free from said trust.

15. I give and bequeath to Mrs. Sallie Duggan, of Littlefield, Texas, the sum of fifty thousand dollars ($50000.00). I also give, devise and bequeath to her all the labors and fractions of labors in the County of Lamb, State of Texas lying north and east of the Pecos and Northern Texas Railway line belonging to me and not sold at the time of my death, said labors having been platted by W. D. Twitchell and being shown and identified on plat recorded in said county as labors 1, 10, 11, 18, and 20 and part of labors 3, 16, and 19 in Capital League 671; parts of labors 2, 3 and 9 in league 687; labor 4 in League 666; part of labors 7 and 24 in League 658; part of labors 20

(continued)

and 25 in League 659 and all of labor 11, in League 660.    All of
Labors 3, 4, 6 and 7 in League 660 in said County including land on
both sides of said railroad shall also be included in said devise.
I also give, devise and bequeath to the said Mrs. Sallie Duggan who
lives in Littlefield, Texas, all lots in the town site of Littlefield,
Texas, as shown on plat made by W. D. Twitchell and recorded in the
plat records of Lamb County, Texas, that have not at the date of my
death been sold or utilized by me for building purposes, that is all
vacant lots in said townsite then owned by me.    I also give, devise
and bequeath to said Mrs. Sallie Duggan lots 3 and 6 in Block 54;
lot 17 in Block 20, lot 6 in Block 47, Lot 12 in Block 48, lots 20
and 21 in Block 29 and lots 2 and 3 in Block 24, all in said town of
Littlefield, Lamb County, Texas, according to said plat with all im-
provements thereon, being the five residences, the hotel and store-
house in said town now owned by me.
16.     I give, devise and bequeath to J. P. White of Roswell, New
Mexico, my undivided half interest in the L. F. D. stock farm of
1250 acres in said state, being the irrigated farm belonging one half
to him and one half to me near said city, together with all my in-
terest in all stock, implements and equipment belonging to said farm
and located thereon at the time of my death.    I also give, devise
and bequeath to said J. P. White all my half interest in several
small tracts of land in said state of New Mexico owned half by him
and half by me and situated in Chaves and Roosevelt Counties, in
said state, being all the interests in land I own in said Counties.
I further give and bequeath to said J. P. White the sum of one hun-
dred thousand dollars ($100000.00).
17.     I give, devise and bequeath to my niece Mrs. Edna Malone, who
resides in Austin, Texas, the property now known as the Queen The-
ater property in Austin, Travis County, Texas, including the rear
portion back to the alley being part of lot one (1) in Block 83 of
said city, being the same property bought by me ( at corner of Con-
gress Avenue and Seventh Street) from James W. Johnson et al on
October 4th, 1912, to which deed and the record thereof in Book 253,
pages 544 to 546 of the deed records of Travis County, Texas, refer-
ence is made for description.    I also give and bequeath to said Mrs.
Edna Malone the sum of sixty thousand dollars ($60000.00).
18.     I give, devise and bequeath to Dr. Whitfield Harral of Dallas,
Texas as trustee for Edgar Harral of Roswell, New Mexico, the twenty
three (23) acres of land near Roswell, New Mexico upon which said
Edgar Harral now lives including the house and all improvements
thereon; and lot number one (1) in Block number 30 in the town of
Littlefield, Lamb County, Texas, together with all improvements there-
on being the banking house in said city owned by me and now occupied
by the Littlefield State Bank.    I also give and bequeath to said
Dr. Whitfield Harral as trustee for said Edgar Harral the sum of

(continued)

thirty thousand dollars ($30000.00) said sum of money to be invested by said trustee in income producing property, or to be lent out, at interest, or part invested and part lent out, or invested in bonds. Said trustee shall have the full management and control of all said property, and if said Edgar Harral shall elect not to live on said farm said trustee shall also rent it out or handle it as he deems best, paying to the said Edgar Harral the net income from same so long as he shall live.   The rights of said Edgar Harral in said property shall be limited to the use, enjoyment and revenues during his natural life, possession of all personal property save income to be held by said trustee and payment of income not to be anticipated by any kind of transfer or order nor subject to any debt or demand against said Edgar Harral.   Net income shall be paid to him in person in cash if necessary to insure his receiving benefit thereof.   After the death of said Edgar Harral all the said property herein described and belonging to said trust shall be sold and the proceeds divided between the widow of Edgar Harral, if she survives him, and his surviving children, share and share alike, and said trust shall terminate.   If any of his children shall have died before his death, leaving a child or children, such child or children shall take such interest in such proceeds as their said parent would have taken had it lived.

19.    I give, and bequeath to my nephew, George T. Littlefield of Kenna, New Mexico the sum of one hundred and forty thousand dollars ($140,000.00).   But my executors are directed to deduct from this sum before payment is made all sums due to my estate on notes of said George T. Littlefield.

20.    I give and bequeath to the following named persons the respective sums following their names: Mrs. Elizabeth French of Roswell, New Mexico, one hundred and forty thousand dollars ($140000.00); Mrs. Lizzie H. Howell, of Luling, Texas, twenty thousand dollars ($20000.00); James R. Key and his children by his first wife, Lula Harral Key of Lampassas, Texas, one hundred and forty thousand dollars ($140000.00); Jim has been a good father and husband and I want him to share equally with said children).   Shelton G. Dowell of Douglas, Arizona, twenty thousand dollars ($20000.00); Maurice Dowell of Luling, Texas, twenty thousand dollars ($20000.00); Dora Alice Pitts of Luling, Texas, twenty thousand dollars ($20000); J. W. White of Mason, Texas, one hundred and forty thousand dollars ($140000.00); George S. Dowell of Austin, Texas, ten thousand dollars ($10000.00); J. C. Butler, nephew of said George S. Dowell, ten thousand dollars ($10000.00); John H. White, Senior of Como, Mississippi, my half brother, thirty thousand dollars ($30000.00); John H. White, Junior of Crenshaw, Mississippi, twenty thousand dollars ($20000.00); Mrs. Rosa West, daughter of John H. White, Senior twenty thousand dollars ($20000.00); Monroe White Copeland, grandson of John H. White, Senior, ten thousand dollars ($10000.00); Dr. Whitfield Harral of Dallas, Texas, one hundred and forty thousand dollars ($140000.00).

                                        (Continued)

21.    I give and bequeath to Miss Selma Lindblad, who has been the nurse and constant companion of my wife the sum of fifty thousand ($50000.00) dollars.    This bequest is conditional upon Miss Lindblad remaining with my wife and caring for her until her death.    If she shall fail to do so, then _this_ bequest shall lapse, and she shall receive nothing from my estate.

22.    I give, devise and bequeath to Mrs. M. M. Harral of Gonzales, Texas, Lot One in Block twenty seven in the town of Gonzales, Texas, being the house and lot she now occupies as a home, her right to be limited to possession, use and enjoyment during her natural life, said property at her death to vest in my niece, Mary Harral, to whom I devise the remainder after termination of said life estate.

23.    In case my wife does not survive me, I give, devise and bequeath to J. P. White, of Roswell, New Mexico, H. A. Wroe of Austin, Texas, and Dr. Whitefield Harral of Dallas, Texas, as trustees for Mrs. Pearl White Wroe, wife of said H. A. Wroe, Miss Libbie White, Mrs. Alice M. Daniel and Mrs. Christine L. Buford, wife of R. A. Buford, all of Austin, Texas, Mrs. Sarah W. Murphy, wife of J. M. Murphy, and Miss Mary Harral, all of Gonzales, Texas, and Mrs. Mildred F. Boone of Roswell, New Mexico, hereinafter referred to as "beneficiaries" and their descendants as hereinafter provided for the length of time and in the manner hereinafter fixed, all of the shares of the capital stock of the American National Bank of Austin, Texas, now owned by me or owned by me at the time of my death (I now own 1579 shares) and the following bonds now owned by me of the par value of seven hundred thousand dollars to wit; Hawaiian 4%, $175000.00, Hawaiian 3 1/2%, $60000.00, Guadeloupe County Road & Bridge 5%, $50000.00, U. S. Panama, 3%, $10000.00; U. S. Consols, 1930, 2% $335000.00, U. S. Panama 2%, $50,000.00, U. S. Liberty 3 1/2%, $13000.00, U. S. Liberty 4%, $7000.00 being the bonds conveyed to me by the American National Bank in exchange for the Littlefield Building in Austin, Texas.    Should any of said stock or bonds be sold or collected prior to my death it is my desire that other bonds, money or property of equal value be substituted therefor and pass to said persons in lieu of those so sold or collected.    In case the American National Bank shall exercise its option to reconvey said Building to me or my estate and demand reconveyance and delivery to it of said bonds, I desire said building and all ground covered thereby to pass to said trustees in lieu of said bonds with like effect as if it had been specifically so provided herein.    The said trustees shall hold, manage and control the said stock and bonds, voting said stock as a unit as the majority of said trustees deems best, and shall have full power to do all things with reference to said stock and bonds that I could do if alive, and especially power to collect all dividends, interest and principal when due, to reinvest the principal in other income producing property and to exchange for other

(continued)

76

.property the bonds or any of them or any property belonging to this trust or to sell same at public or private sale on such terms and for such price as they may deem best and reinvest the proceeds in other income producing property when thay or a majority of them deem best, to pay all taxes and charges of every character on any property of said trust of any kind held by them, to make all contracts and do all things reasonably necessary or desirable in the management care and control of any property belonging to said trust, including the power to make repairs, improvements, alterations, to contract for insurance, advertisement and the like, the enumeration of certain powers not to be held to limit the broad grant herein made, and shall pay the net income received from said property share and share alike (after deducting the payments hereinafter provided for Mrs. Alice Wright) to the beneficiaries named above and to the descendants of those who die prior to January 1st, 1933, the latter to take per stirpes.    In case any of said named beneficiaries shall die before January 1st, 1933 and leave no child or children, grandchild or grandchildren, surviving her, the said net income shall thereafter be divided as it would have been hereunder had such deceased beneficiary not been mentioned herein.    Such payments shall be made as frequently as is convenient as money is received, but the said trustees shall have the right to retain such amount as is necessary to meet anticipated obligations and liabilities.    No improvement costing more than $10000.00 shall be made in any property hereafter owned by said trust except by the unanimous vote of the trustees.    In addition to the payments of income to the beneficiaries named above and their descendants as herein provided for, I direct said trustees to pay to my niece, Mrs. Alice Wright, who now resides in Los Angeles, California, the sum of one hundred and fifty dollars ($150.00) per month from the time of my death until January 1st, 1933 provided that such monthly payments shall continue only so long as she continues to reside in that state.    Temporary absence therefrom not to exceed three months are not to be considered as an abandonment of residence in that state, but if she remains out of the state after my death and prior to January 1st, 1933 continuously for more than three months at any one time, then no further payment shall be made to her by said trustees, and this entire paragraph shall, as to further payments of every character to her be null.    Her descendants shall have no interest in said trust property and her rights shall be limited to said monthly payments and said twenty thousand dollars ($20000.00). On January 1st, 1933, if said Mrs. Alice Wright be living and has resided in said state from the time of my death without an absence of more than three months at any one time (such residence to be presumed in the absence of evidence to the contrary) the said trustees shall pay to her out of the said trust property or the income therefrom or from the proceeds of the sale of so much as may be necessary

the sum of twenty thousand dollars ($20000.00).    This payment shall
be made before the division of said trust property into equal shares
as herein provided for, she not being a "beneficiary".    In case any
of the beneficiaries named above shall die before January 1st, 1933,
without leaving a child or children, grandchild or grandchildren,
who lives or live until said date, then her interest in the body of
said trust property be divided as it would have been under the pro-
visions hereof had the name of such deceased beneficiary not been
mentioned in this portion of this will.    On January 1st, 1933, the
said trustees shall divide the remainder of said property belonging
to said trust into as many equal shares as there are then living
beneficiaries named above and deceased beneficiaries who have left a
child or children, or grandchild or grandchildren who are still liv-
ing at said time.    One such share shall be delivered to each of the
beneficiaries named above who still lives and has a living child or
children grandchild or grandchildren, such named beneficiary to take
full and complete title to and ownership of such property free from
said trust and without limitation or remainder to anyone.    One share
shall be delivered to the child or children share and share alike, of
such named beneficiaries who has died prior to said date leaving a
child or children who lives on said date.    One such share shall be
delivered to the grandchild or grandchildren share and share alike,
of each named beneficiary who has died prior to January 1st, 1933,
who leaves no child or children who lives on said date, but who leaves
a grandchild or grandchildren who lives on said date.    The shares
set aside for the named beneficiaries living on January 1st, 1933,
who have no child or children or grandchild or grandchildren then
living shall be retained by said trustees and net income therefrom
paid to the respective beneficiaries for whom it is set apart until
the death of such named beneficiaries referred to in this sentence.
As each one dies, her interest or share so set aside shall vest share
and share alike in the above named beneficiaries then living who have
received shares of said property and in the descendants of those who
have died, the latter to take per stirpes and all to be free from
said trust and to have full and complete ownership without limitation
or remainder,    Should any of said named beneficiaries live after
January 1st, 1933, and have no child or children, or grandchild or
grandchildren at that time, but afterward have born a child then her
share so set apart shall at once be delivered to her by said trustees,
and she shall have full and complete ownership thereof free from said
trust without limitation or remainder to anyone.   An adopted child,
children, grandchild or grandchildren as herein used.    None of the
payments of income while said property is in the hands of said trus-
tees, shall be subject to any debt or demand against any of the
beneficiaries, nor be anticipated by any character of order or trans-
fer and same shall be made in person in cash, if necessary to ef-
fectuate this intention.

                              (continued)

24.    I give, devise and bequeath to Mrs. Georgia Cole, of Wilson County, Texas, one hundred and forty thousand dollars ($140000.00).
25.    I give, devise and bequeath to Ida W. Walker of Gonzales, Texas; the sum of one hundred and forty thousand dollars ($140000.00).
26.    I give, devise and bequeath to Mildred F. Boone during her natural life the house and lots in Roswell, New Mexico, she now occupies as a home;    It is my intention to limit her right to the possession, use and enjoyment of said property during her natural life with remainder to her descendants.
27.    I give, devise and bequeath to Dr. Whitfield Harral of Dallas, Texas, all stock and notes of the Pierce Oil Company and all stock of the Southwestern Life Insurance Company owned by me at the time of my death, same to be in addition to other gifts to him.
28.    I give, devise and bequeath to Ed. Rhodes Littlefield Wroe, of Austin, Texas, the east half of Block one (1) in Whitis Addition to the City of Austin, Texas, being my present home, together with all furniture and household goods of every character therein.
29.    I give and bequeath to my grandniece, Elizabeth Wroe, the sum of twenty thousand dollars ($20000.00) same to be given to her by my executors within one year after my death.
30.    I have subscribed $40000.00 to the building of the Jefferson Davis monument on the Jefferson Davis homestead at Fairview, Kentucky.    That amount has been paid.    If the directors charged with constructing this monument shall raise twenty thousand dollars after the date of this will to finish this monument, then I direct my executors to pay said directors for said purpose an additional sum of $10000.00 if needed to finish same.
31.    I desire that my executors shall expend the sum of fifteen thousand dollars out of my estate for a suitable monument on my lot in the cemetery in Austin when my wife and I shall be buried.
32.    It is my desire that my executors shall operate my interest in the Yellow House Ranch in Hockley and Lamb Counties, Texas for five years after the conclusion of the present war with Germany or five years after my death should war be concluded before my death.  Provided that in no event shall such operation continue longer than eight years after my death.    It is my wish that J. P. White shall act as manager of the said ranch under the direction of the said executors and that he shall make full reports to the executors annually or oftener as desired.    After the expiration of the period above fixed my executors shall sell all the land belonging to me and not herein disposed of and all my interest in the cattle, horses, stock, animals, implements, property and equipment of every character on said ranch. One million dollars of the proceeds of the sale of such land and other property and all property not otherwise disposed of shall be donated to the Board of Regents of the University of Texas to be used  for the construction of a main building for the said University, same to

(continued)

be constructed on the campus now used and occupied by the said University and nowhere else.

If the University shall before that time have constructed or provided for the construction of a main building, then such sum may be used by said Board of Regents for the construction of one or two other buildings all to be constructed on said campus now occupied and nowhere else.    This gift is made on condition that the Board of Regents shall pass a resolution that the location of the University shall not be removed from its present position in the City of Austin, Texas. But such resolution shall state that it is to be understood that branches of the University may be maintained or established elsewhere, but that the main University shall remain at its present location, and that if sufficient ground cannot be secured in the immediate neighborhood of said campus for construction of buildings for said University such ground may be secured elsewhere in the City of Austin, Texas, but that the present campus or available ground in the neighborhood shall be utilized so far as is consistent with the space there available before any buildings are constructed elsewhere.    It is understood that such a resolution on the part of the Regents would probably not be binding, but I believe that if they pass such a resolution and accept this gift, their successors and the people of this state would feel themselves morally bound thereby.

33.    All the residue of my property shall be divided among the various legatees and devisees under this will in the following manner; my executors shall estimate the cash value at the time of my death of each devise, gift and bequest herein made, the value of estates for life, remainders and similar interests to be estimated on the basis of the actuaries combined experience tables at four per cent interest compounded annually, except that when property is left to a trustee or trustees and remainder shall not be figured separately, but legacies and devises to trustees shall be figured at the value of the property left to such trustees at the time of my death, and the additional money passing to such trust property under this section of this will shall be added to the trust estate and be used and disposed of and pass as is the other property given to such trustees hereunder. When such cash value has been estimated for each legatee, devisee, trustee or trustees or beneficiary under this will the entire residue of the property of my estate shall be divided among such devisees, legatees, and trustees, each to receive such proportion thereof, as such estimated value of his, her, its or their gift, legacy or devise bears to the total of the estimated values of all gifts, legacies and devises hereunder.

My servant Nathan Littlefield Stokes is excepted from the operation of this section of this will and shall receive nothing hereunder.

In case Mildred F. Boone be living when such division of such residue is made no estimate of the value of the remainder herein created of

(continued)

the home she now occupies shall be made, but the entire cash value of the full ownership of such property shall be estimated and she shall be allowed to participate in such residue in proportion thereto, and in such event, her descendants shall take only such remainder under this will and shall not share in such residue; if she is dead at the time of such division her descendants shall take such portion of such residue as she would take if living.

34.  Whenever in this will property is left to one person as trustee for another person, persons, or for the benefit of the University of Texas, such trustee shall unless limited herein, have full power to keep, hold, manage, control and dispose of all or any part of such property, to sell, convey or encumber or make contracts concerning same in the same manner as I could have done in my lifetime except that no property shall be encumbered during the term of any life estate.   If any property shall be sold except for the purpose of partition, the proceeds shall be invested in income producing property which shall be held by such trustee in lieu of the property sold.

35.  My said trustees without diminishing the general power given herein are authorized to collect, compromise, discharge give releases, sell, transfer and assign any claims, bonds, debts or liens securing same held by them under the terms of this will and to make all necessary or desirable repairs, alterations or improvements in any property held by them under the terms of this will, and to make all agreements necessary or desirable for the efficient management and control of said property, it being my intention to authorize them to manage the property as I could if living, except as herein expressly limited.

36.  Whenever in this will, a life estate is created in any person with remainder to his or her children or descendants and any child of such person shall have died before or after my death and prior to the time of the death of its parent herein mentioned then if such child shall have left a surviving child or children, being the grandchild or grandchildren of such deceased parent such grandchild or grandchildren shall take such interest in the property herein mentioned as their said deceased parent would have taken if living.

I make this will, feeling that I am dealing fairly and justly with my relatives herein mentioned, and with the express demand and condition that if any of the beneficiaries hereunder is dissatisfied and contests the probate of this will or does anything, or in any way encourages others to do anything to prevent the probate of this will or the realization of all my wishes as herein expressed, then I hereby will and direct that such person or persons shall forfeit his or her interest in my estate as provided in this will with like effect as if such beneficiary's name had not been mentioned herein.

If I survive my wife, it is my will that construction of the bronze arch and the dormitory building provided for herein shall be in any

(continued)

event commenced within fifteen years of my death.

As stated above in case my wife shall survive me, then paragraphs 5, 6 and 7 and paragraphs 12 to 33 inclusive are to be of no force and effect and this will administered and my estate settled and property pass as if those paragraphs had not been included herein and this in spite of and notwithstanding any rule of construction to the contrary.

Interlineations have been made in this will as follows: in paragraph 4, the following: "West 1/2 of"; in paragraph 6 the words "position of"; in paragraph 12, "shall"; in paragraph 18, the words "said Edgar Harral in"; in paragraph 22 the word "Life"; in paragraph 23 the words "per", "is", "one", "monthly" and the words "and deceased beneficiaries"; in paragraph 28 the words "Whitis Addition to"; in paragraph 30 the words "said directors for said purpose"; in paragraph 32 the word "the"; in paragraph 33 the words "and pass" and the word "b2".

I close with the request that these two friends sign this will as witnesses.  In witness whereof, I have hereunto signed my name this the 1st day of July, 1918.

<div style="text-align:center">Geo. W. Littlefield.</div>

The above and foregoing will this day was subscribed by the maker thereof, George W. Littlefield, in our presence, he having declared that the same is his last will and testament, and having requested that we sign the same as witnesses, and in his presence and in the presence of each other we hereunto subscribe our names as attesting witnesses this the 1st day of July, 1918.

<div style="text-align:center">D. H. Hart, Jr.<br>L. A. Colwell.</div>

Endorsed: No. 5220. Estate of Geo. W. Littlefield, Decd. Will filed Nov. 20, 1920. Fred C. Malone, Clerk County Court, Travis Co. Tex. By W. Trenckmann, Deputy.

<div style="text-align:center">CODICIL</div>

THE STATE OF TEXAS )
COUNTY OF TRAVIS     )    Know all men by these presents: That I, George W. Littlefield, do make, declare and publish this my first codicil to my will of date July 1st, 1918.

1.    Mrs. M. M. Harral having died and all notes referred to in paragraphs three (3) of said will having been paid, I direct and it is my will that said paragraph three be given no effect and hereafter held for naught.

II.    In paragraph seven (7) of said will it is provided that the deed to be executed shall provide that certain property shall revert to my estate on a certain contingency.  It is my will and I direct that if my wife, Alice P. Littlefield shall survive me, said deed when

<div style="text-align:right">(continued)</div>

executed shall provide for such reversion to her and if she does not survive me then that such deed shall provide for such reversion to the residuary legatees under my said will their respective interests to be the same as in the residue of my estate as provided in paragraph thirty three (33) of my said will, the condition of reversion to remain unchanged.

III.    I direct and it is my will that H. A. Wroe, of Austin, Texas, J. P. White of Roswell, New Mexico, and Doctor Whitfield Harral of Dallas, Texas act as executors of my estate as provided in said will, and that after their duties as executors shall have been completely discharged they shall act as trustees to carry out my wishes expressed in said will as modified by this codicil.    If any of them shall die, or shall refuse or shall fail from any cause to act, then the remainder shall act as such executors and trustees.

IV.    I direct and it is my will that paragraph fourteen (14) of my said will shall be given no effect and be hereafter held for naught and that the following be substituted in lieu thereof:

"14.    I give and bequeath to said Doctor Whitfield Harral as trustee for my nephew, Victor P. Harral of Gonzales, Texas one hundred thousand dollars ($100,000.00) said sum to be paid by my executors to said Harral as trustee for my said nephew and his descendants.    The said trustee shall invest the said money in notes, bonds or other income producing property with all powers given to trustees under my will and shall pay the net income and revenues therefrom to my said nephew during his natural life.    Said payments shall not be anticipated by any previous transfer or order, nor be subject to any debt or demand of any character against my said nephew, and same shall, if necessary to assure his getting the benefit thereof be paid to my said nephew in cash in person by said trustee, and said trustee in order to effectuate this intention shall have the right to withhold for as long as one year payment of such income to my nephew.    Upon the death of my said nephew the property belonging to said trust fund, including all property purchased with said sum or in which same has been invested shall pass to and vest in the children of my said nephew share and share alike free from said trust, provided that if any of his children shall have died leaving a descendant such descendant or descendants shall take such share as such deceased child would have taken if it had lived.    Income accrued or collected but not paid over shall vest likewise."

V.    It is my will and I direct that paragraph fifteen (15) of my said will shall be given no effect and shall be hereafter held for naught and that the following shall be substituted in lieu thereof:

"15.    I give, and bequeath to Mrs. Sallie Duggan of Littlefield, Texas  the sum of one hundred thousand dollars ($100000.00)."

VI.    It is my will and I direct that paragraph sixteen (16) of my said will shall be given no effect and hereafter held for naught and that the following shall be substituted in lieu thereof:

(continued)                83

FED. LAND BANK
HOUSTON

"16.    I give, devise and bequeath to Mrs. Elizabeth French of Roswell, New Mexico, my undivided one-half interest in two hundred and forty-one acres out of the northwest corner of the L. F. D. stock farm of 1250 acres near said city in said state and direct that my executors cause such tract to be surveyed in a convenient shape out of the said corner of said farm and that they execute a deed conveying said interest therein to her by metes and bounds.    If J. P. White of Roswell, New Mexico shall within one year after my death convey to or cause to be vested in her the other undivided one-half interest in said 241 acres so surveyed, then I give, devise and bequeath to the children of said J. P. White living at the time of my death all my interest in the remainder of said farm, including all stock, implements and equipment belonging thereto and located thereon at the time of my death. I also give, devise, and bequeath to the said J. P. White all my half-interest in several small tracts of land in said state of New Mexico owned half by him and half by me and situated in Chaves and Roosevelt Counties in said state, being all the interests in land I own in said counties.  I further give and bequeath to said J. P. White the sum of one hundred thousand dollars ($100,000.00)."

VII.    It is my will and I direct that the bequest of sixty thousand dollars ($60,000.00) made to Mrs. Edna Malone in paragraph seventeen (17) of my said will shall be reduced to fifty thousand dollars ($50,000.00).

VIII.    It is my will and I direct that the bequest of one hundred and forty thousand dollars ($140,000.00) made to George T. Littlefield in paragraph nineteen (19) of my said will shall be reduced to one hundred thousand dollars ($100,000.00).

IX.    It is my will and I direct that the following changes be made in paragraph twenty (20) of my said will, towit, the bequest to Mrs. Elizabeth French shall be reduced from one hundred and forty thousand dollars ($140,000.00) to one hundred thousand dollars ($100,000.00), the bequest to James R. Key and his children by his first wife shall be reduced from one hundred and forty thousand dollars ($140,000.00) to one hundred and thirty-five thousand dollars ($135,000.00), and the bequest to John H. White, Senior, of Como shall be reduced from thirty thousand ($30,000.00) to twenty thousand dollars ($20,000.00).    It is my will and I direct that the said sum of one hundred and thirty-five thousand dollars shall be divided between said James R. Key and his said children share and share alike.

X.    Miss Selma Lindblad and Mrs. M. M. Harral having died and the property having been otherwise disposed of, it is my will and I direct that paragraphs twenty-one (21) and twenty-two (22) of my said will shall be given no effect and be hereafter held for naught.

XI.    It is my will and I direct that the bequest of one hundred and forty thousand dollars ($140,000.00) to Mrs. Georgia Cole in paragraph twenty-four of my said will shall be reduced to one hundred and

(continued)

84

twenty thousand dollars ($120,000.00).

XII.    It is my will and I direct that the amount of money ($10,000.00) named in the last line of paragraph thirty (30) of my said will shall be reduced to two thousand dollars ($2,000.00).

XIII.   Since my said will was executed, Mrs. Pearl White Wroe wife of H. A. Wroe has died leaving two children, Ed Rhodes Littlefield Wroe and Elizabeth Wroe.    Under the provisions of paragraph twenty-three (23) of my said will said children together get a share of the income from the shares of bank stock and bonds named therein and of the property upon termination of the trust.    I will and direct that said paragraph twenty-three (23) of my said will be so modified that said H. A. Wroe shall share equally with his said children in the said income and the property referred to in said paragraph when same is thereunder freed from said trust and that said share of such income and property shall be divided among said H. A. Wroe and his said two children or the survivors of them share and share alike.    These three persons or the survivor or survivors of them shall take such share of the said income and property as under the terms of said paragraph 23 Mrs. Pearl White Wroe would take if she had lived until the termination of said trust and then had a living child.

XIV.    I will and direct that paragraph eleven of my said will shall be given no effect and be hereafter held for naught and that the following be substituted in lieu thereof:

11.    In case my wife, Alice P. Littlefield, survives me, this will shall take effect as if paragraphs numbered twelve to thirty-three (12 to 33) inclusive had not been included herein.    In case she does not survive me, then all parts of this will save paragraph eight (8) shall take effect and constitute my will.

XV.    I likewise will and direct that that portion of my said will following paragraph thirty-six (36) as follows:

"As stated above in case my wife shall survive me, then paragraphs 5, 6, 7 and paragraphs 12 to 33 inclusive are to be of no force and effect and this will administered and my estate settled and property pass as if those paragraphs had not been included herein and this in spite of and notwithstanding any rule of construction to the contrary." shall be modified so as to eliminate therefrom the words and figures "paragraphs 5, 6, and 7 and", it being intended by paragraphs XIV and XV hereof to so modify my said will that if my wife does survive me paragraphs five (5), six (6) and seven (7) thereof shall nevertheless be given effect as a part of my will, and that if I shall die before my wife does, then my said will shall be given full force and effect with the exception of paragraphs 12 to 33 inclusive thereof, which latter are to be operative only if survive my wife.

XVI.    It is my will and I direct that IV to XIII of this codicil, relating as they do to paragraphs of my said will that do not take effect if my wife survives me, shall also in such event fail to take

(continued)

85

85

effect, but should I survive my wife, then the whole of this codicil shall take effect.    Paragraphs thirty-one  of my said will provides for erection of monument on my cemetery lot.    Should my wife survive me, this provision of my will is inoperative, but I suggest to her that she have my wishes in this matter carried out.    This is only a request and she can do as she likes.

Except as modified by this codicil the said will of date July 1st, 1918, shall remain in full force and effect.

The word "of" is interlined in the line before the last on page four hereof.    There are no other interlineations herein.

Signed by me, the said George W. Littlefield on this the 14th day of October, A. D. 1919 in the presence of Sam Harlan and R. C. Roberdeau whom I have requested to attest this codicil as witnesses.

(Signed)    George W. Littlefield.

The above and foregoing codicil covering this and four other pages was signed by the testator George W. Littlefield, in our presence, and we, at his request, in his presence and in the presence of each other, hereby attest the same on this the 14th day of October A. D. 1919.

(Signed)        Sam Harlan,
R. C. Roberdeau.

## CODICIL NUMBER TWO

STATE OF TEXAS        )
COUNTY OF TRAVIS    )    KNOW ALL MEN BY THESE PRESENTS: That I, George W. Littlefield, of Austin, Texas, do make, declare and publish this my second codicil to my will of date July 1st, 1918.

1.    I direct and it is my will that the gift of two hundred thousand dollars to Will C. Hogg, H. A. Wroe and the person who occupies the position of president of the University of Texas as trustees to erect a bronze arch provided for in paragraph six (6) of my said will shall be increased to the sum of two hundred and fifty thousand dollars ($250,000.00), the other provisions of said paragraph to remain unaffected.    It appears that it will take several years to plan and erect this arch, and I am now contemplating making a contract for the commencement of the work before my death.    Should I do this, and should I die before this arch is completed it is my desire and I direct that the trustees shall proceed to carry out the said contract and this whether there are different persons acting as trustees or not.    I direct that all payments that have been made by me before my death shall be deducted from said sum of two hundred and fifty thousand dollars ($250,000.00), and the balance paid by my executors to said trustees under said paragraph.    My executors need not pay the full balance at one time but may pay portions thereof from time to time as needed.

(continued)

2. As I have sold all of the stock and notes of the Pierce Oil Company belonging to me, I desire to modify paragraph twenty seven (27) of my said will by eliminating therefrom the said stock and notes, the bequest of the stock in the Southwestern Life Insurance Company to remain unaffected.

3. In paragraph two (2) of my said will I provide for payment of one thousand dollars to my brother William P. Littlefield on the first day of January and on the first day of July of each year, such payments to continue during his natural life. I desire to modify said paragraph so as to provide that after the death of the said William P. Littlefield such payments shall continue to be made by my executors to his wife E. K. Littlefield and that after the death of said William P. Littlefield my executors shall pay to his said wife the sum of one thousand dollars ($1,000.00) on the first day of January of each year and a similar sum on the first day of July of each year, such payments to continue during her natural life and to be made under the same conditions, circumstances and in the same manner as is provided in said paragraph for the payments to my said brother.

4. In paragraph sixteen (16) of my said will I provided for certain gifts to J. P. White. In paragraph VI of the first codicil to my said will executed by me on the 14th day of October, 1919, I modified this paragraph. It is my desire and I direct that said paragraph sixteen (16) both as written in the said will and as rewritten in the said codicil shall be of no effect and be hereafter held for naught and that the following shall be substituted in lieu thereof:

"16. I give, devise and bequeath to J. P. White of Roswell, New Mexico all my half interest in several small tracts of land in said state of New Mexico owned half by him and half by me, and situated in Chaves and Roosevelt Counties in said State, being all the interests in land I own in said counties. I further give and bequeath to said J. P. White the sum of one hundred thousand dollars ($100,000.00).

5. I direct and it is my will that paragraph fourteen (14) of my said will and paragraph IV of my first codicil thereto amending or changing said paragraph fourteen shall hereafter be given no effect and be hereafter held for naught and that the following be substituted in lieu thereof:

"14. I give and bequeath to Victor P. Harral of Gonzales, Texas, the sum of one hundred thousand dollars, and to Mrs. Hilda Hodges of Roswell New Mexico the sum of fifty thousand dollars.

6. I direct and it is my will that paragraph eighteen (18) of my said will shall hereafter be given no effect and be held for naught and that the following shall be substituted in lieu thereof:

"18. I give, devise, and bequeath to Edgar Harral of Roswell,

(continued)

New Mexico, during his natural life with remainder to his wife and
children the twenty three acres of land near Roswell, New Mexico
upon which said Edgar Harral now lives including the house and all im-
provements thereon, and lot number one (1) in Block number thirty (30)
of the town of Littlefield, Lamb County, Texas, together with all im-
provements thereon, the same being the banking house in said city
owned by me and occupied by the Littlefield State Bank, the rights of
said Edgar Harral therein to be limited to the use, revenues, and en-
joyment during his natural life.    After his death said property shall
vest in his wife and children share and share alike.    I further give,
devise and bequeath to said Edgar Harral the sum of one hundred thous-
and dollars ($100,000.00).

7.    It is my will and I direct that paragraph seventeen (17)
of my said will as modified by paragraph seven (7) of the first codi-
cil therein shall be goven no effect and the same is hereby revoked
and hold for naught and the following is substituted therefor:

17.    I give, devise, and bequeath to my niece Mrs. Edna Malone,
wife of Ross Malone of Austin, Travis County, Texas, the sum of one
hundred and forty thousand dollars ($140,000.00) in cash, and said
sum of one hundred and forty thousand dollars ($140,000.00) shall con-
stitute the total and entire amount that the said Mrs. Edna Malone
shall receive under my will and the codicils thereto.

8.    I have provided in paragraph thirty (30) of my said will as
modified by paragraph XII of my said first codicil thereto that my
executors shall pay to the directors charged with constructing the
jefferson Davis monument the sum of two thousand dollars ($2,000.00).
This amount is to be paid when such directors certify that suffi-
cient funds have been secured to finish said monument when expended
in connection with said sum of two thousand dollars ($2,000.00).
Should they fail to so certify within four years of my death, then
this gift shall lapse and be of no further effect.

9.    I give, devise, and bequeath to Miss Ruth Key, the daughter
of J. R. Key of Lampassas, Texas, the sum of twenty-five thousand dol-
lars ($25,000.00).    This bequest is conditional upon Miss Key re-
maining with my wife Alice P. Littlefield and with me and helping
care for us until our deaths.    If she shall fail to remain with us
until each of us are dead then this bequest shall lapse and be given
no further effect.

10.    In paragraph seven (7) of my said will I provide for the
construction of a girls dormitory on the lots East of my present home.
It is my wish that such dormitory shall be large enough to comfort-
ably accommodate one hundred and fifty girls.    Should the sum pro-
vided for in said paragraph seven be not sufficient to build such a
building as is provided for in said paragraph and as modified herein,
then I direct that my executors shall pay to said trustees an addi-
tional fifty thousand dollars ($50,000.00) or so much thereof as may
be necessary to add to the original amount to construct such a dormi-
tory.    The decision as to whether additional money is needed to

(continued    88

construct such a dormitory as I desire built on said lots shall be left to a majority of the trustees named in said paragraph seven of said will, and their decision shall be final and upon their certifying that they need additional money not to exceed fifty thousand dollars ($50,000.00), my executors shall pay the same to them out of the property of my estate; The decision as to whether such additional money is needed may be left until the building is finished if deemed best by said trustees and by my executors by unanimous vote of all.

In paragraph twenty eight (28) of my said will I devise to Ed Rhodes Littlefield Wroe of Austin, Texas, the East one-half of Block One (1) in Whitis Addition to the City of Austin, Texas; being my present home, together with all furniture and household goods of every character therein. It is my desire and I direct that said paragraph twenty-eight (28) of my said will, dated the first day of July, A. D. 1918, be so amended that the University of Texas be substituted in place of the said Ed Rhodes Littlefield Wroe, of Austin, Texas, so that said paragraph twenty-eight (28) shall hereafter read as follows:

"28:  I give, devise and bequeath to the University of Texas at Austin, Texas, the East one-half of Block One (1) in Whitis Addition to the City of Austin, Texas, being my present home, together with the improvements thereon situated; but not to include the furniture and household goods therein; but said property shall not pass to the University of Texas, nor be turned over to said University of Texas until after the death of my beloved wife. It is my desire that the furniture and household goods which may be in my home at the death of my wife shall be handled and disposed of for the benefit of my estate by the executors to my will, H. A. Wroe, Dr. Whitfield Harral and J. P. White, as they may deem best and proper.

11.  I have named H. A. Wroe, J. P. White and Dr. Whitfield Harral as executors of my will and to act as trustees when their duties as executors are ended, should any of said persons die, or fail or refuse to qualify and act as such executor and trustee then the two others acting with the judge of the District Court of Travis County, Texas, for the 53rd Judicial District shall, by majority vote, name some person to take the place of the one so dying, or failing or refusing. Should more than one of said named persons die or refuse or fail from any cause to so qualify and act; then substitutes for them shall be named by the person who is judge of said District Court of Travis County, Texas, and the person who is presiding judge of the Supreme Court of Texas, or if he, for any reason, does not act, any associate justice of the Supreme Court of Texas acting with the one of said named persons, if any, who does qualify and act. In the event substitutes are so appointed and later vacancies occur, they shall be filled in like manner. The agreement of two men shall be necessary to name such a substitute. Should any other

(continued)

person named in my said will as a trustee die or fail or refuse to act as such trustee then after a reasonable time a substitute for such person shall be named by a majority vote of those acting as executors under my will or as board of trustees after the functions of executors have ended.   If for any reason the method of appointing substitutes for any executor or trustee hereunder shall fail after a reasonable time the District Court of Travis County on application of any interested person shall appoint a substitute or substitutes.   This paragraph is intended to modify paragraph III of the said first codicil to my said will by eliminating the last sentence thereof and substituting therefor the method herein prescribed.   Upon the appointment of any substitute under this paragraph those who make the appointment shall determine whether any bond shall be given or not, and if they decide to require a bond, shall fix the amount and form thereof and shall pass upon the sufficiency of the security so required.   Those making the appointment are authorized to dispense with the giving of bond by any such substitute, but to do so the vote must be unanimous of those authorized to make the appointment.

12.   In paragraph XIII of the said first codicil to my said will this language is used:   "These three persons or the survivor or survivors of them shall take such share of the said income and property as under the terms of said paragraph 23 Mrs. Pearl White Wroe would have taken if she had lived until the termination of said trust and then had a living child."   It is my will that the following sentence be added to said paragraph XIII after said language: "This provision with regard to survivorship is intended to govern only should one or more of said three persons die without leaving a living child or children. Should any of said three persons die prior to the termination of said trust and the distribution of the property leaving a child or children not named in this paragraph 12 such child or children shall take such portion of said income and property as its said deceased parent would have taken if living.

13.   In the last part of paragraph XV of my said first codicil appear the words: "which latter are to be operative only if survived by my wife."   It is my will that this be modified so as to read as follows: "which latter are to be operative only if I survive my said wife."

14.   It is my will and I direct that paragraphs two, four, five, six, seven, eight, nine, and thirteen of this codicil, relating as they do to paragraphs of my said will and codicil that do not take effect if my wife survives me, shall also in such event fail to take effect. The other portions of this codicil shall take effect whether I survive my wife or not.   If I survive my wife the whole of this codicil shall take effect.

15.   Except as modified by this codicil, the said will of date July 1st, 1918, as modified by the first codicil thereto of date October 14th, 1919, shall remain in full force and effect.   Modifications

(continued)   90

of a part of a paragraph shall not affect the remainder unless such intention clearly appears.

16. It is my desire and I hereby declare that paragraph twenty-nine (29) of my said will executed on the first day of July A. D. 1918, is hereby revoked and held for naught and that the following shall be substituted in lieu thereof:

"I give, devise, and bequeath to my grand niece Elizabeth Wroe and to my great Nephew Ed Rhodes Littlefield Wroe the sum of Twenty Thousand Dollars ($ 20,000.00) each; the same to be given to her and him by my executors within one year after my death; this in addition to the other gifts and legacies provided for in my will and the codicils thereto in favor of said Elizabeth Wroe and Ed Rhodes Littlefield Wroe.

17. It is my will and I direct and I hereby bequeath to H. A. Wroe, father of Elizabeth Wroe and Ed Rhodes Littlefield Wroe in his own name and right, the sum of twenty thousand Dollars ($20,000.00), in addition to the gifts and legacies heretofore given him in paragraph thirteen (13) of the codicil executed on the 14th day of October, A. D. 1919.

18. It is my will and I direct that paragraph twenty-seven (27) of my will dated the first day of July A. D. 1918 be hereinafter held for naught and revoked and that the following shall be substituted in lieu thereof.

"I give, devise and bequeath to Dr. Whitfield Harral of Dallas, Texas, all stock of the Southwestern Life Insurance Company owned by me at the time of my death, and a sufficient sum of money in cash when added to an amount equal to the book value of said stock to make the total sum of one hundred and eighty thousand dollars ($180,000.00); which said sum of one hundred and eighty thousand dollars ($180,000.00) shall constitute the entire and total amount which the said Dr. Whitfield Harral shall receive and take under my said will and the codicils thereto.

19. It is my desire that the following clause in Section 32 of my will dated July 1st, 1918, to-wit: "One million dollars of the proceeds of the sale of such lands and other property and of the property not otherwise disposed of shall be donated to the Board of Regents of the University of Texas to be used for the construction of a Main Building for the said University same to be constructed on the campus now used and occupied by the said University and nowhere else." shall be and the same is hereby revoked and I hereby direct that the said University of Texas shall be the residuary legatee of my estate only, and that after all legacies and devises provided for are delivered to other parties as stated in my will, and all the expenses and taxes as provided for in my will have been satisfied and disposed of in the manner as provided for in my said will and the codicils thereto, then all other property of my estate, not so disposed of, I hereby given

(continued)

and bequeath to the Board of Regents of the University of Texas to be used by them for the construction of a main building for said University, same to be constructed on the campus now used by the said University and nowhere else; provided that the amount of the property to be given to the University of Texas as residuary legatee under my said will, shall not, in any event, exceed the sum of Five Hundred Thousand Dollars ($500,000.00).

.20.    I hereby give unto my executors full power and authority to employ such attorneys and such clerical help as to them may be deemed necessary, the persons to be employed to be left to their discretion and judgment, concerning the handling and administration of my estate, the expenses therefor to be paid out of my estate; I also direct that all taxes and expenses of whatsoever character shall be paid out of my estate, that is, that none of the legacies provided for in my said will and the codicils shall bear any portion of the burden of any and all expenses connected with my estate or the taxes that may be due thereon.

This codicil to my will, together with the original will and the other codicils thereto, while in separate documents from the will and codicils of my wife, Alice P. Littlefield are simultaneously made with a view to the common good of our entire community estate, and it is my desire and has been my intention at the making of the same that they shall be construed together with the will and codicils thereto of my wife, which I have seen, and are here referred to and made a part hereof as though written herein word for word; that is, it is my intention and desire that the will and codicils of my wife and my will and the codicils thereto shall be construed as one joint instrument and will.

Signed by me, the said George W. Littlefield, at Austin, Texas, on this the ___9th___ day of November, A. D. 1920, in the presence of Mrs. Lillie C. Eugene Haynie and Nannie Z. Huddle,    whom I have requested to attest this codicil as witnesses.

                                        Geo. W. Littlefield.

The above and foregoing codicil covering this and nine other pages was signed by the testator, George W. Littlefield in our presence, and we at his request, in his presence, and in the presence of each other, hereby attest the same on this the 9th day of November A. D. 1920.

                                        Mrs. Lillie C. Eugene Haynie

                                        Nannie Z. Huddle.

                                (continued)

92        92

PROOF OF WILL.    Filed Jany. 11, 1921.    Rec. prob. Min. Vol. 45, page 114.    On this the 11th day of January, 1921, personally appeared in open court, D. H. Hart Jr., who being duly sworn, deposes and says, that on the 1st day of July, 1918, he was present and saw George W. Littlefield sign the instrument filed in this court on the 20th day of November, 1920, and now shown to him, bearing date on the 1st day of July, 1918, and purporting to be the last will of him, the said George W. Littlefield, and heard him publish and declare the same to be his last will and testament; that at the time of signing and publishing the same said George W. Littlefield was 21 years of age and of sound mind; that this affiant and L. A. Colwell, whose signature appears on said instrument, on said 1st day of July, 1918, then being credible witnesses above the age of 14 years, subscribed their names as witnesses to the same, in the presence and at the request of said testator, and in the presence of each other.    That afterward, on the 10th day of Nov. 1920, said George W. Littlefield died in said County of Travis, in which he had his domicile at and before his death, and without having revoked said will, so far as known to affiant.

D. H. Hart Jr.

Sworn to and subscribed in open Court before me, this 11th day of January, 1921.
(Seal)

Fred Malone, Clerk County Court, Travis Co., Tex.
By W. Trenckmann, Deputy.

PROOF OF 1ST CODICIL.    Filed Jan. 11, 1921.    Rec. Prob. Min. Vol. 45, page 115.    Made and duly sworn to by R. C. Roberdeau, stating that he was present and saw George W. Littlefield sign the instrument purporting to be the first codicil to the will of said Littlefield, dated Oct. 14, 1919, that at said time decd. was 21 years old and of sound mind; that affiant and Sam Harlan whose signature appears on said instrument then being credible witnesses over 14 years of age, subscribed their names as witnesses in presence and at request of testator and in presence of each other; that afterwards on Nov. 10, 1920, said George W. Littlefield died in Travis Co. Tex. without having revoked said will and codicil thereto so far as is known to affiant.

PROOF OF 2nd CODICIL.    Filed Jany. 11, 1921, Rec. Prob. Min. Vol. 45, page 116.    Made and duly sworn to by Nannie Z. Huddle, stating that she was present and saw George W. Littlefield sign the instrument purporting to be the second codicil to the will of said Littlefield, dated Nov. 9, 1920, that at said time decd. was 21 years old and of sound mind; that affiant and Mrs.(Lilly C.) Eugene Haynie, whose signature appears on said instrument then being credible witnesses over 14 years of age, subscribed their names as witnesses in presence and at request of testator and in presence of each other; that afterwards

(continued)

on Nov. 10, 1920, said George W. Littlefield died in Travis Co. Tex. without having revoked said will and codicil No. Two thereto so far as is known to affiant.

Similar proof made by Mrs. Lilly C. Eugene Haynie on said dated, Jan. 11, 1920.

ORDER PROBATING WILL.    Filed Jan. 11, 1921; Rec. Prob. Min. Vol. 45, page 114.    On this the 11th day of January, 1921, came on to be heard the application of H. A. Wroe, J. P. White, and Whitfield Harral, for the probate of a certain instrument of writing now produced in open court and alleged to be the last will and testament of George W. Littlefield, deceased, and for letters testamentary thereon, to which application there is no opposition, and upon a hearing of the evidence of the witnesses in open court, statements of which evidence were reduced to writing and signed and sworn to in open court by said witnesses, as prescribed by law, and which affidavits are filed with the papers in this cause; and it appearing to the court that the said George W. Littlefield at the time of executing said will was over 21 years of age, was of sound mind, and that he is now dead, and that four years have not elapsed since his decease, and that this court has jurisdiction of his estate, and that citation has been issued, served and returned in the manner and for the length of time required by law, and that said George W. Littlefield decd, executed said will with all the formalities and solemnities, and under the circumstances required by law to make it a valid will and that the same has never been revoked by testator, and that said will consists of an instrument dated July 1, 1918; together with first codicil dated Oct. 14, 1919, and Codicil No. 2, dated Nov. 9, 1920, and that H. A. Wroe, J. P. White and Whitfield Harral are named in said will as executors thereof, without bond, and are not disqualified by law from accepting said letters testamentary thereon; it is therefore by the Court considered, ordered, adjudged and decreed that said will, consisting of said instruments in writing, is proved, and that it be admitted to probate and recorded as last will and testament of George W. Littlefield, decd. and application for probate, citation, sheriff's return and testimony be recorded with will in minutes of this court, etc. and said will directing that no bond or other security be required of said executors;    It is further considered, ordered, adjudged and decreed by the Court that letters testamentary on same will be and same are hereby granted to said H. A. Wroe, J. P. White and Whitfield Harral upon the taking by them of the oath prescribed by law, and the clerk of this court is hereby directed to issue letters testamentary in accordance with this order to said H. A. Wroe, J. P. White, and Whitfield Harral when they shall have qualified according to law with full powers as independent executors under said will, without bond. And it further appearing to the Court that Fred Rightor, and A. T. Knies, and K. H. Schneider are citizens of Travis Co. Tex. and

(continued)

disinterested persons in said estate, it is therefore ordered that they, or any two of the, be and are hereby appointed to appraise said estate, real and personal, of Geo. W. Littlefield decd.
OATHS OF EXECUTORS. Filed Jan. 11, 1921, Rec. Prob. Min. 45, page 120. Oaths taken separately by H. A. Wroe, J. P. White, and Whitfield Harrall in following form, towit: I Do solemnly swear, that the writing which have been offered for probate are the last will of George W. Littlefield, so far as I know or believe, and that I will well and truly perform all the duties of executor of said will of the estate of George W. Littlefield, deceased.
Each oath duly sworn to in open court etc.
LETTERS TESTAMENTARY.    Issued to said Executors Jan. 11, 1921, Rec. Prob. Min. Vol. 45, page 121, signed by County Clerk, Travis Co. Texas.
INVENTORY AND APPRAISEMENT. Filed Feb. 24, 1921, Rec. Prob. Min. Vol. 45, page 275.

Now come your appraisers, L. J. Schneider, A. T. Knies, and Fred E. Rightor, three disinterested persons, citizens of Travis County, Texas, heretofore appointed by the Court, together with the Executors, H. A. Wroe, J. P. White and Whitfield Harral and submit the following inventory and appraisement, produced before the undersigned appraisers on 21 day of February, 1921, by H. A. Wroe, J. P. White and Whitfield Harral, the Executors of said will of the Estate of George W. Littlefield, deceased:
SEPARATE PROPERTY  of Geo. W. Littlefield: None.
COMMUNITY PROPERTY:
An undivided 1/2 interest in and to the following Real Estate:
In Hockley County, Texas.

| Grantee | League No. | Acres | Value |
|---|---|---|---|
| Abner Taylor | 692 | 4523.6 | $27,141.60 |
| do | 693 | 4590.0 | 27,540.00 |
| do | 694 | 4525.6 | 27,153.60 |
| do | 707 | 4524.5 | 27,147.00 |
| do | 708 | 4534.0 | 27,204.00 |
| do | 709 | 4501.0 | 27,006.00 |
| do | 714 | 4546.9 | 27,281.40 |
| do | 715 | 4508.4 | 27,050.40 |
| do | 716 | 4518.2 | 27,109.20 |
| do | 722 | 4510.8 | 27,064.80 |
| do | 721 | 4539.1 | 27,234.60 |
| do | 723 | 4561.3 | 27,367.80 |
| do | 728 | 4546.0 | 27276.00 |
| do | 729 | 4530.6 | 27,183.60 |
| do | 730 | 4544.1 | 27,264.60 |
| do | 731 | 4562.0 | 27,372.00 |
| do | 732 | 4551.0 | 27,306.00 |
| do | 733 | 4525.7 | 27,154.20 |

(continued)

|      | do | 734 | 4520.4 | 27,122.40 |
|------|----|-----|--------|-----------|
|      | do | 735 | 4523.0 | 27,138.00 |
|      | do | 736 | 4541.7 | 27,250.20 |
|      | do | 733 | 320.2 | 1,921.20 Strip |
|      | do | 732 | 240.0 | 1,440.00 West |

In Lamb County, Texas.

|      | do | 661 | 4514.8 | $36,118.40 |
|------|----|-----|--------|-----------|
|      | do | 662 | 4577.8 | 36,622.40 |
|      | do | 674 | 4431.6 | 35,452.80 |

Jno. H. Stephens Section

|      | do | 4 | 759.3 | 4,555.80 |
|------|----|-----|--------|-----------|
|      | do | 5 | 728.9 | 4,573.40 |
|      | do | 6 | 288.8 | 1,732.80 |

| League | Labor | Acres | Value |
|--------|-------|-------|-------|
| 659 | 7 N. 1/2 | 88.5 | $1,106.25 |
|  | 8 | 177.1 | 2,213.75 |
|  | 20 | 88.5 | 1,106.25 |
|  | 24 N. E. 1/4 | 44.0 | 550.00 |
|  | 25 | 86.0 | 1,075.00 |
| 663 | 5 E. 1/2 | 94.0 | 1,175.00 |
|  | 19 W. 1/2 | 88.5 | 1,206.25 |
|  | 23 W. 1/2 | 97.3 | 1,216.25 |
| 665 | 20 W. 1/2 | 88.5 | 1,106.25 |
|  | 21 | 177.1 | 2,213.75 |
|  | 25 Part of S Ry | 80.0 | 1,000.00 |
| 666 | 7 | 177.1 | 2,213.75 |
|  | 14 N. 1/2 | 88.5 | 1,106.25 |
|  | 18 W. 1/2 | 88.5 | 1,106.25 |
|  | 21 | 177.1 | 2,213.75 |
|  | 22 E. 1/2 | 88.5 | 1,106.25 |
|  | 25 E. 1/2 | 88.55 | 1,106.87 1/2 |
| 672 | 9 Part S.of Ry. | 40.0 | 500.00 |
|  | 12 | 177.1 | 2213.75 |
|  | 18 | 177.1 | 2213.75 |
|  | 19 | 177.1 | 2213.75 |
| 673 | 16 | 177.1 | 2213.75 |
|  | 21 | 88.5 | 1106.25 |
|  | 25 | 177.1 | 2213.75 |
| 675 | 1 | 177.1 | 2213.75 |
|  | 9 | 177.1 | 2213.75 |
|  | 10 | 177.1 | 2213.75 |
|  | 11 | 177.1 | 2375.75 |
|  | 12 | 177.1 | 2313.75 |
|  | 13 | 177.1 | 2313.75 |

(continued)

In Lamb County, Texas.

| League | Labor | Acres | Value |
|--------|-------|-------|-------|
| 675 | 18 | 177.1 | $2313.75 |
| | 19 | 177.1 | 2313.75 |
| | 20 | 177.1 | 2313.75 |
| | 21 | 193.3 | 2416.25 |
| | 22 | 193.1 | 2413.75 |
| | 23 | 192.8 | 2410.00 |
| | 24 | 192.5 | 2406.25 |
| | 25 | 192.6 | 2407.50 |
| 687 | 2 | 177.1 | 2213.75 |
| | 3 | 177.1 | 2213.75 |
| | 4 | 177.1 | 2213.75 |
| | 5 | 190.0 | 2375.00 |
| | 6 | 177.1 | 2213.75 |
| | 9 | 177.1 | 2213.75 |
| | 11 Part S. of Ry. | 150.0 | 1875.00 |
| | 12 | 177.1 | 2213.75 |
| | 14 | 177.1 | 2213.75 |
| | 16 | 186.7 | 2333.75 |
| | 17 | 186.7 | 2333.75 |
| | 18 | 177.1 | 2213.75 |
| | 19 | 177.1 | 2213.75 |
| | 20 | 177.1 | 2213.75 |
| | 21 | 194.4 | 2430.00 |
| | 22 | 177.1 | 2213.75 |
| | 23 | 194.3 | 2328.75 |
| | 24 | 194.2 | 2427.50 |
| | 25 | 201.0 | 2512.50 |
| 660 | 4 | 194.1 | 2426.25 |
| | 5 | 194.1 | 2426.25 |
| | 6 | 177.1 | 2213.75 |
| | 7 | 177.1 | 2213.75 |
| | 8 | 177.1 | 2213.75 |
| | 13 Part N. Ry. | 39.0 | 487.50 |
| 664 | 2 S. E. corner | 27.0 | 337.50 |
| | 6 | 177.1 | 2213.75 |
| | 14 | 177.1 | 2213.75 |
| | 17 | 177.1 | 2213.75 |
| | 23 W. 1/2 | 93.2 | 1165.00 |
| | 24 | 189.5 | 2368.75 |
| | 12 | 177.1 | 2213.75 |
| | 20 | 177.2 | 2215.00 |
| | 21 | 197.0 | 2562.50 |

(continued)

In Lamb County, Texas.

| League | Labor | Acres | Value |
|--------|-------|-------|-------|
| 671 | 1 | 193.1 | 2413.75 |
| | 3 | 96.5 | 1206.25 |
| | 9 | 177.1 | 2213.75 |
| | 10 | 177.1 | 2213.75 |
| | 11 | 177.1 | 2213.75 |
| | 12 | 177.1 | 2213.75 |
| | 18 | 177.1 | 2213.75 |
| | 19 N. 1/2 | 88.5 | 1106.25 |
| | 20 | 177.1 | 2213.75 |
| | 21 | 177.1 | 2213.75 |
| | 22 | 177.1 | 2213.75 |
| | 23 | 177.1 | 2213.75 |
| | 24 | 177.1 | 2213.75 |
| | 16 | 80.0 | 1000.00 |
| 686 | 5 | 177.1 | 2213.75 |
| | 10 | 182.1 | 2283.75 |
| | 11 | 186.4 | 2330.00 |
| | 14 | 177.1 | 2213.75 |
| | 15 | 186.6 | 2332.50 |
| | 16 | 182.8 | 2285.00 |
| | 17 | 177.1 | 2213.75 |
| | 20 | 177.1 | 2213.75 |
| | 21 | 212.4 | 2655.00 |
| | 22 | 193.9 | 2423.75 |
| | 23 | 193.8 | 2422.50 |
| | 25 | 195.6 | 2445.00 |

Total                    $197,936.87-1/2

Interest of Testator being an undivided 1/2 interest in above lands and those on preceding page (2). Total interest of testator in the lands on preceding three pages, $445,760.53.

An undivided 1/2 interest in the following lots, tract or parcels of land situated in the Town of Roswell, County of Chaves, State of New Mexico:-

| | |
|---|---|
| Blocks 16, 37 & 38, Military Heights, containing 23 acres | $1380.00 |
| Lots 1 & 2, Block 46, West Side Addition | 2800.00 |
| Total | $4180.00 |
| Int. of Testator being undivided 1/2 int. | $2090.00 |

(continued)

93

An undivided 1/3 interest in the following lots, tracts or parcels of land situated in Town of Roswell, County of Chaves, State of New Mexico:

Part of Lot 122, Lea's Subdivision being 34.9' x 181.33' and
21.33' x 50'                                        $770.00
                              Int. of Testator ..     192.50

An undivided 2/7 interest in the following lots, tracts or parcels of land situated in Roosevelt County, State of New Mexico:

S. W. 1/4, S. W. 1/4 Sec. 24; N. W. 1/4 N. W. 1/4 Sec. 25; E. 1/2
S. W. 1/4 Sec. 27, Twp. 5, South, Range 30 East, 160 acres-- $1725.00
                              Interest of Testator -------     492.85

An undivided 2/7 interest in the following lots, tracts or parcels of land situated in Chaves County, New Mexico:

E. 1/4 N. W. 1/4; N. E. 1/4 S. W. 1/4; S. 1/2 S. W. 1/4 Sec. 21.
S. W. 1/4 N. E. 1/4; N. 1/2 S. E. 1/4 Sec. 25;
N. 1/2 N. W. 1/4; S. W. 1/4 N. W. 1/4; W. 1/2 S. W. 1/4 Sec. 28, all
in Twop. 6 SR. 26 E. 520 acres,                    $1690.00

E. 1/2 N. W. 1/4; S. W. 1/4 N. W. 1/4; N. W. 1/4 S. W. 1/4; S. E.
1/4 S. W. 1/4; Sec. 8;
N. 1/2 N. W. 1/4; S. W. 1/4 N. W. 1/4 Sec. 17.
S. E. 1/4 S. W. 1/4; S. W. 1/4 S.E. 1/4 Sec. 20;
W. 1/2 N. E. 1/4; S. E. 1/4 N. W. 1/4; E. 1/2 S. W. 1/4 Sec. 29
S. E. 1/4 S. E. 1/4 Sec. 30;
E 1/2 N. E. 1/4; S. W. 1/4 N. E. 1/4; S. W. 1/4 S. W. 1/4 Sec. 31, aall
Twp. 7 S. R. 26 E. 840 acres                       $2730.00

Lot 1; S. E. 1/4 N. E. 1/4 Sec. 1; S. E. 1/4 S. W. 1/4 Sec. 1;
E. 1/2 N. W. 1/4; S. W. 1/4 N. W. 1/4; W. 1/2 S. W. 1/2 Sec. 12;
W. 1/2 N. W. 1/2 Sec. 13; S. 1/2 S. E. 1/4 Sec. 23;
N. 1/2 N. E. 1/4 Sec. 26, all Twp. 8 S. R. 25 E. - 560 acres $1820.00
                              Total                  .6240.00
Interest of Testator being an undivided 2/7 interest    1782.85 5/7
                              Total of all above      $4558.20 5/7

An undivided 1/2 interest in the following lots, tracts or parcels of land in the City of Austin, Travis of Travis and State of Texas, towit:

| Lot | Block | Outlot | Division | Value |
|---|---|---|---|---|
| 7 to 12 | 1 | 15, 16 & 17 | D | $40,000.00 |

(continued)

99

| Lot | Block | Outlot | Division | Value |
|---|---|---|---|---|
| 2 | 3 | 15,16 & 17 | D | $2,250.00 |
| 1 | 3 | 15,16 & 17 | D | 2,750.00 |
| 12 W. 1/2 | 8 | 15,16 & 17 | D | 750.00 |
| 1 | 83 | Orig. Townsite | | 50,000.00 |
| Amount paid on Queen Theater Building to Nov. 11, 1920 | | | | 49,965.25 |
| Total Value | | | | $145,715.00 |
| Testator's undivided 1/2 interest | | | | 72,857.50 |

An undivided 1/2 interest in the following lots, tracts or parcels of land in the Town of Littlefield, County of Lamb and State of Texas.

| Lot | Block | Value |
|---|---|---|
| 1 & 2 | 30 | $2,400.00 |
| 1/2 interest | | 1,200.00 |

An undivided 3/8 interest in the following lots, tracts or parcels of land in the Town of San Angelo County of Tom Green, State of Texas, towit:

| Lot | Block | Value |
|---|---|---|
| 1 & 2 | | $35,000.00 |
| 3/8 interest | | 13,125.00 |

(Follows inventory of personal property, notes, bonds, etc.)

We the undersigned appraisers, solemnly swear that the foregoing is a full and fair appraisement of the Estate of George W. Littlefield decd. produced before us by H. A. Wroe, Whitfield Harral, and J. P. White, Executors.

            (signed)              K. J. Schneider,
                                   A. T. Knies,
                                   Fred E. Righter.

Sworn to and subscribed before me, this the 24th day of Feb. 1921.
                             Emma V. Hay, Notary Public,
(Seal)                       Travis County, Texas.

We, H. A. Wroe, Whitfield Harral, and J. P. White, executors each do solemnly swear that the foregoing inventory and list of claims is a full and complete inventory and list of the property and claims of George W. Littlefield, deceased that have come to the knowledge of us or either of us.

                        (continued)

Probate #5220.                    -35-

                         Whitfield Harral,
                         J. P. White,
                         H. A. Wroe.

Sworn to and subscribed before me, this the --- day of Feby. 1921.

                         Emma V. Hay, Notary Public,
(Seal)                   Travis County, Texas.

ORDER APPROVING INVENTORY, ETC. Rec. Prob. Min. Vol. 45, page 274.
    On this the 24 day of Feby. 1921, came on to be heard the in-
ventory, appraisement and list of claims of the Estate of George
W. Littlefield, deceased, filed herein by H. A. Wroe, Whitfield Har-
ral and J. P. White, Independent Executors of said estate.    And it
appearing that same is correct and complies with the law and is signed
and sworn to by the executors, and by Fred E. Righter, L. J. Schneider
and A. T. Knies, heretofore appointed appraisers in this matter, and
that the same was filed within the time prescribed by law.
    It is therefore ordered and decreed that the same be and it is
hereby in all things and respects approved and ordered recorded in
the probate minutes of this court.


Filed for Record in Lamb County Texas, May 10, 1921.
Recorded in Vol. 13, pp. 323-347, Deed Records.

                                                           101

TAB D

SUBCHAPTER K. MONUMENTS, MEMORIALS, AND HISTORIC SITES

Sec. 2166.501.  MONUMENTS AND MEMORIALS.  (a)  A monument or memorial for Texas heroes of the Confederate States of America or the Texas War for Independence or to commemorate another event or person of historical significance to Texans and this state may be erected on land owned or acquired by the state or, if a suitable contract can be made for permanent preservation of the monument or memorial, on private property or land owned by the federal government or other states.
(b)  The graves of Texans described by Subsection (a) may be located and marked.
(c)  The commission shall maintain a monument or memorial erected by this state to commemorate the centenary of Texas' independence.
(d)  Before the erection of a new monument or memorial, the commission must obtain the approval of the Texas Historical Commission regarding the form, dimensions, and substance of, and inscriptions or illustrations on, the monument or memorial.

Added by Acts 1995, 74th Leg., ch. 41, Sec. 1, eff. Sept. 1, 1995.


Sec. 2166.5011.  REMOVAL, RELOCATION, OR ALTERATION OF A MONUMENT OR MEMORIAL.  (a)  In this section, "monument or memorial" means a permanent monument, memorial, or other designation, including a statue, portrait, plaque, seal, symbol, building name, or street name, that:
(1)  is located on state property;  and
(2)  honors a citizen of this state for military or war-related service.
(b)  Notwithstanding any other provision of this code, a monument or memorial may be removed, relocated, or altered only:
(1)  by the legislature;
(2)  by the Texas Historical Commission;
(3)  by the State Preservation Board;  or
(4)  as provided by Subsection (c).
(c)  A monument or memorial may be removed, relocated, or altered in a manner otherwise provided by this code as necessary to accommodate construction, repair, or improvements to the monument or memorial or to the surrounding state property on which the monument or memorial is located.

109

Any monument or memorial that is permanently removed under this subsection must be relocated to a prominent location.

Added by Acts 2001, 77th Leg., ch. 377, Sec. 7, eff. Sept. 1, 2001.

TAB E



(http://www.utsystem.edu)

# Rule 60101: Acceptance and Administration of Gifts

**Sec. 1 Authority to Accept Gifts and Develop Acceptance Procedures.**

The authority to accept gifts to The University of Texas System or to any of the institutions is vested in the Board of Regents and delegated by the Board as specifically set out in this Rule. Except as provided in this Rule or any other Rule in the Regents' *Rules and Regulations*, or approved institutional policies, no member of the staff of any institution has the authority to accept gifts.

**Sec. 2 U. T. System Gift Acceptance Procedures.**

The Board delegates to the Vice Chancellor for External Relations the authority and responsibility to promulgate a set of guidelines regarding the acceptance, processing, investment, and administration of gifts. These guidelines, known as The University of Texas System Administration Policy UTS138, *Gift Acceptance Procedures* [1], shall be adhered to by the U. T. System and the institutions. In promulgating the *U. T. System Gift Acceptance Procedures* [1], the delegate shall also consider provisions to:

**2.1**

111

accomplish the goal of increasing financial support for the U. T. System through the appropriate assistance of donors,

**2.2**

allow staff members to respond to donor initiatives quickly and with certainty,

**2.3**

establish administrative processes to accept and administer gifts in a prudent and efficient manner, with fiduciary responsibilities of fundamental importance,

**2.4**

comply with the Texas Constitution and applicable federal and State law,

**2.5**

comply with the provisions of the *Internal Revenue Code* [2] and related regulations,

**2.6**

specifically incorporate provisions related to the acceptance of pledges for current purpose commitments to fund endowments, and in conjunction with a gift-related naming of a facility or program as follows:

(a) for gifts and pledges to name a facility or program, a U. T. System approved gift agreement, which includes defined pledge payment terms, must be in place,

(b) prior to the creation of an endowment, at least 20% of the donors' total required minimum funding must be received and a U. T. System approved gift agreement, which contains defined pledge payment terms, must be in place, and

(c) the pledge payment duration for either endowed or non-endowed gifts shall not exceed five years. However, with the written approval of the Vice Chancellor for External Relations, the pledge period may be longer than five years under special circumstances, and

**2.7**

provide that, in the interest of financial responsibility and

efficiency, it is the specific preference of the Board that all endowment gifts be eligible for commingling for investment purposes with other endowment funds.

**Sec. 3 Board Approval of Nonconforming Gifts.**

Recommendations regarding the acceptance of gifts or other actions that do not conform to all relevant policies, including but not limited to the *U. T. System Gift Acceptance Procedures* [1], shall be made through the Vice Chancellor for External Relations to the Board of Regents after review by appropriate offices of the terms of the gifts, the nature of the donated assets, and/or the requested action.

**Sec. 4 Gifts of Art**

**4.1 Outdoor Works of Art.**

Approval by the Board is also required prior to the acceptance of a gift of an outdoor work of art. Considerations will include appropriateness with regard to the institution's Campus Master Plan and expense related to installation and/or continuing maintenance.

**4.2 Gifts of Statuary Depicting Living Persons.**

No gift of statuary depicting a living person shall be accepted by an institution, unless intended for display in a museum or for addition to the collection of works of art for display in a museum. Authority to accept proposed museum gifts of statuary depicting living persons, intended for display indoors, is delegated to the presidents. Proposed gifts of statuary intended for outdoor display require approval under Section 4.1 above.

**Sec. 5 Approval of Conforming Gifts.**

The Board of Regents delegates to the Chancellor or the president of an institution, following prior review and approval by the Deputy Chancellor, the appropriate Executive Vice Chancellor, and the Vice Chancellor for External Relations, the authority to accept conforming gifts, including pledges, other than gifts of real property, that are

not processed or administered by the Office of External Relations, and the authority to take any and all desirable actions relating to the administration and management of gifts accepted by the Chancellor or the president of the institution, as may be permitted by applicable law, policies, these Regents' *Rules and Regulations*, and the *U. T. System Gift Acceptance Procedures* [3].

**Sec. 6 Gifts Requiring Approval by Executive Director of Real Estate.**

The Board of Regents delegates to the Executive Director of Real Estate authority to accept all conforming gifts of real property of any value that are not processed or administered by the Office of External Relations, and the authority to take any and all desirable actions relating to the administration and management of gifts accepted by the Executive Director of Real Estate, as may be permitted by applicable law, policies, the *U. T. System Gift Acceptance Procedures* [1], The University of Texas System Administration Policy UTS161, *Environmental Review for Acquisition of Real Property* [4], and these Regents' Rules and Regulations, including Rule 60103 [5] concerning guidelines for acceptance of gifts of real property. Acceptance of all gifts of real property shall be subject to the Regents' Rules and Regulations, Rule 60103 [5] and The University of Texas System Administration Policy UTS161, *Environmental Review for Acquisition of Real Property* [4].

**Sec. 7 Gifts Requiring Approval by Vice Chancellor for External Relations.**

The Board of Regents delegates to the Vice Chancellor for External Relations authority to accept all conforming gifts, including pledges, of any value (either in cash or in kind) that are processed or administered by the Office of External Relations. The Board also delegates to the Vice Chancellor

for External Relations authority to take any and all desirable actions relating to the administration and management of gifts accepted by the Office of External Relations, including without limitation the modification or termination of trusts and endowments as may be permitted by applicable law, policies, these Rules and Regulations, and the *U. T. System Gift Acceptance Procedures* [1].

**7.1 Gifts Reviewed.**

The Office of Development and Gift Planning Services, with assistance from the Real Estate Office, the University Lands Office, and the Office of General Counsel as required, shall review all gift assets processed or administered by the Office of External Relations and certain gift assets that the Chancellor or president is authorized to accept. Gift assets requiring review include, but are not limited to, securities, interests in limited partnerships, stock of closely-held corporations, stock of S corporations, stock options, and warrants. The Office of Development and Gift Planning Services shall also review all bequests, interests in trusts, gifts, and other funds to establish endowments and other planned gifts as defined in the *U. T. System Gift Acceptance Procedures* [1].

**7.2 Gifts to Establish Endowments.**

Endowments will be established with gifts that have been completed for tax purposes or with a combination of such gifts, pledges, and other funds at a minimum funding level of $10,000.

**Sec. 8 Internal Revenue Service Forms.**

The Board of Regents delegates to the Chancellor, the Executive Director of Real Estate, the Vice Chancellor for External Relations, and the president of the institution the authority to execute all necessary Internal Revenue Service forms, including without limitation IRS Forms 8283 [6] and 8282 [7], that relate to gifts accepted by each.

**Sec. 9 Gift Benefiting an Individual.**

Neither the U. T. System nor any of the institutions will administer a gift for the benefit of any designated individual unless the donor is exempt from federal income taxes as defined by the Commissioner of Internal Revenue.

**Sec. 10 Service by Board as Estate Executor/Administrator.**

The Board of Regents will not serve as executor or administrator of an estate because of the potential for conflicts of interest and the scope of the required duties.

**Sec. 11 Prohibition to Act as Witness to Will.**

The employees of the U. T. System or any of the institutions should not knowingly act as witnesses to wills in which the U. T. System or an institution is named as a beneficiary so as not to jeopardize the receipt of the bequest.

**Sec. 12 Service by Employee as Executor/Administrator of Estate or Trustee of Trust.**

Employees of the U. T. System or any of the institutions who agree to serve as trustee of a trust, or executor or administrator of an estate benefiting the U. T. System or any of the institutions are immediately to notify the Office of Development and Gift Planning Services of their appointment. Upon notification, the employee will be furnished with a statement advising of the potential for conflicts of interest and directing that all communications pertaining to the trust or estate between the employee and any office of the U. T. System or the institutions shall be in writing.

**Definitions**

None

**Amended Log:**

Editorial amendment to Section 5 made July 13, 2015
May 15, 2014

Editorial amendments to Sections 6, 7.1, and 8 made
September 1, 2010
November 13, 2008
February 9, 2006
December 10, 2004
📄 60101 [8]
📄 60101 [9]
Details
**Series:**
60000: Development
60101
Acceptance and Administration of Gifts
**Who Should Know:**
Administrators
Chief Business Officers
Development Officers
Employees
**Responsible Offices:**
External Relations
General Counsel
**Date Approved:**
December 10, 2004
**Date Last Amended:**
July 13, 2015
bor@utsystem.edu [10]
**Relevant Federal and State Statutes:**
Internal Revenue Code of 1986, as amended [2]
Texas Education Code Section 65.36 (f) and (g) – Donations
for Professorships and Scholarships [11]
Texas Property Code, Chapter 163 – Management,
Investment, and Expenditure of Institutional Funds [12]
Relevant System Policies, Procedures, and Forms
Rule 60103: Guidelines for Acceptance of Gifts of Real

Property [5]

Rule 60202: Endowed Academic Positions [13]

UTS161 Environmental Review for Acquisition of Real Property [4]

UTS138 Gift Acceptance Procedures [1]

&lt;div class="terms"&gt;&lt;ul class="links inline"&gt;&lt;li class="taxonomy_term_16 first"&gt;&lt;a href="http://www.utsystem.edu/offices/external-relations/all" rel="tag" title=""&gt;External Relations&lt;/a&gt; &lt;span class="print-footnote"&gt;[14]&lt;/span&gt;&lt;/li&gt; &lt;li class="taxonomy_term_21"&gt;&lt;a href="http://www.utsystem.edu/offices/general-counsel/all" rel="tag" title=""&gt;General Counsel&lt;/a&gt; &lt;span class="print-footnote"&gt;[15]&lt;/span&gt;&lt;/li&gt; &lt;li class="taxonomy_term_1146 last"&gt;&lt;a href="http://www.utsystem.edu/tag/60000-development" rel="tag" title=""&gt;60000: Development&lt;/a&gt; &lt;span class="print-footnote"&gt;[16]&lt;/span&gt;&lt;/li&gt; &lt;/ul&gt;&lt;/div&gt;

**Links:**
[1] http://www.utsystem.edu/board-of-regents/policy-library/policies/uts138-gift-acceptance-procedures
[2] http://www4.law.cornell.edu/uscode/uscode26/usc_sup_01_26.html
[3] http://www.utsystem.edu/board-of-regents/policy-library/policies/uts138-gift-acceptance-procedures
[4] http://www.utsystem.edu/board-of-regents/policy-library/policies/uts161-environmental-review-acquisition-real-property
[5] http://www.utsystem.edu/board-of-regents/rules/60103-guidelines-acceptance-gifts-real-property
[6] http://www.irs.gov/pub/irs-pdf/f8283.pdf
[7] http://www.irs.gov/pub/irs-pdf/f8282.pdf
[8] http://www.utsystem.edu/sites/utsfiles/offices/board-of-regents/rules-regulations/60101.doc
[9] http://www.utsystem.edu/sites/utsfiles/offices/board-of-regents/rules-regulations/60101.pdf
[10] mailto:bor@utsystem.edu
[11] http://www.statutes.legis.state.tx.us/Docs/ED/htm/ED.65.htm#65.36

[12] http://www.statutes.legis.state.tx.us/Docs/PR/htm/PR.163.htm
[13] http://www.utsystem.edu/board-of-regents/rules/60202-endowed-academic-positions
[14] http://www.utsystem.edu/offices/external-relations/all
[15] http://www.utsystem.edu/offices/general-counsel/all
[16] http://www.utsystem.edu/tag/60000-development



(http://www.utsystem.edu)

Home > Board of Regents > Policy Library > Printer-friendly

# UTS138 Gift Acceptance Procedures

**Index Type:**
UTS
**Index Number - Primary:**
138
**Name:**
Gift Acceptance Procedures
Table of Contents [1]
**Sec. 1 Purpose.**
Private sector support is critical to The University of Texas System. Contributions from individuals, foundations, corporations, and other entities are vitally important to the fulfillment of the institution's mission and to the provision of high-quality educational opportunities. The purpose of these procedures is to clarify and facilitate the process for making

gifts to the U. T. System and the U. T. institutions (collectively referred to hereafter as "U. T.").

**Sec. 2 Procedures.**

As authorized by the Board of Regents' *Rules and Regulations*, Rule 60101 [2] these procedures are designed to outline administrative processes associated with the acceptance, administration, and investment of gifts processed or administered by the Office of Development and Gift Planning Services (ODGPS), as the designee of the Vice Chancellor for External Relations in a prudent and efficient manner, with fundamental fiduciary responsibilities kept firmly in mind. These procedures also cover gifts given for current purposes, including gifts of securities, gifts of family limited partnerships, bequests, trust distributions, personal property, life insurance and retirement plan assets. These procedures are also intended to ensure that staff members are able to function in a timely, effective, and professional manner in the context of institutions that are engaged in energetic and comprehensive fundraising efforts. When these procedures do not indicate an appropriate course of action or if they are inappropriate in light of all aspects of a specific situation, staff members are directed to consult with the relevant offices as outlined in these procedures to establish an appropriate course of action.

Item 3 provides definitions for terms used throughout the Gift Acceptance Procedures.

The Acceptance of Gifts Conforming to Policy Matrix summarizes the review and acceptance process.

**Sec. 3 Responsibility to Donors.**

3.1 Donor's Expectations.  U. T. staff should make reasonable efforts to be aware of and sensitive to donors' expectations.

3.2 Legal and Professional Advice.  U. T. representatives shall not provide legal and/or tax advice and will advise all

prospective donors in writing to seek such advice from their own counsel and professional consultants. Each U. T. representative should be knowledgeable about gifts and should disclose to the donor advantages and disadvantages that could reasonably be expected to influence the decision of the donor to make a gift to U. T. In particular, planned gift items that may have adverse tax implications to the donor or are subject to variability (such as market value and income payments) should be discussed fully.

3.3 Donor's Best Interests.  U. T. will not knowingly accept a gift that it believes to be contrary to the donor's best interests and there must be a reasonable expectation that accepting the gift will ultimately benefit U. T.

3.4 Appraisals and Valuations.  U. T. will not furnish property appraisals or valuations to donors for tax purposes or any other purpose. U. T. will not knowingly participate in a transaction in which the value of a gift is inflated above its true fair market value to obtain a tax advantage for a donor.

3.5 Written Acknowledgment and Disclosure.  In accordance with best stewardship practices and the provisions of the *Internal Revenue Code* of 1986, as amended (the "Code"), and related regulations, U. T. will provide a timely written statement or acknowledgment of a donor's contribution that includes the institution's name; amount of cash contribution or description (but not value) of non-cash contribution; and a statement that no goods or services were provided by the institution in return for the contribution (if that was the case) or description and good faith estimate of the value of goods or services, if any, the institution provided in return for the contribution. The U. T. System and the U. T. institutions are agencies of the State of Texas and are described in Sections 170(b)(1)(A)(v) and 170 (c)(1) of the Code. Contributions to the U. T. System and the institutions are deductible by

donors under Section 170 of the Code provided such contributions are made exclusively for public purposes. Gifts or grants that must be given to a 501(c)(3) organization may be made to The University of Texas Foundation, Inc.

3.6 Tax Filing.  In accordance with the provisions of the Code, and related regulations, proper gift records will be kept and required tax returns filed by the Office of External Relations (OER) or its designee, the ODGPS, for all gifts processed and/or administered by the ODGPS, as designee of the Vice Chancellor for External Relations. The Vice Chancellor for External Relations or the Vice Chancellor's designee(s), or, with respect to real property, the Executive Director of Real Estate, shall execute all necessary Internal Revenue Service (IRS) forms that relate to gifts processed or administered by the ODGPS, including IRS Forms 8283 and 8282. Forms 8283 and 8282 will otherwise be executed by the Chancellor or the appropriate officer at the beneficiary institution.

3.7 Confidentiality.  U. T. staff will adhere to strict confidentiality with regard to any information, records, and personal documents pertaining to donors and gifts. All gift records will be released only when authorized by the donor or as required by law. A limited exception to the disclosure of the name of the donor is provided in Section 552.1235 of the Texas Government Code.

3.8 Anonymity.  U. T. shall respect the wishes of donors wishing to support U. T. anonymously and will take reasonable steps to safeguard those donors' identities.

**Sec. 4 Review and Acceptance of Proposed Gifts.**

4.1 Authority to Accept Gifts.  The authority to accept gifts to U. T. is vested in the Board of Regents of The University of Texas System (Board) and delegated by the Board as specifically set out in Board of Regents' *Rules and Regulations*, Rule 60101 [2].  Except as provided in Rule

60101 or any other Rule in the Regents' *Rules and Regulations* or approved institutional policies, no member of the staff of any U. T. institution has the authority to accept gifts. All gifts must be made payable or placed in the name of the Board, The University of Texas System or a U. T. institution as applicable. Gifts made payable to a U. T. employee are not deductible as a charitable contribution and benefit the employee personally, not U. T.

4.2 Designate a High Level Responsible Receipt Party. The President of each U. T. institution and the Vice Chancellor for External Relations must appoint a Designated Receipt Executive. It is anticipated the Designated Receipt Executive will usually be the Chief Development Officer of each institution. The Designated Receipt Executive may designate another staff member to assume day-to-day responsibility for the receipting process. Each institution must develop written receipt procedures. The Designated Receipt Executive shall ensure all gift receipts are handled in accordance with the receipt procedures set out by each institution without exception.

4.3 Procedures. The institutions shall submit for consideration gifts to be processed or administered by the ODGPS to the ODGPS as soon as practical, following the procedures outlined below. Prior to acceptance by the ODGPS, the ODGPS must review all gift assets processed or administered by the OER, other than cash or marketable securities. Such review will be done in conjunction with other U. T. System Administration offices and, as appropriate, with The University of Texas Investment Management Company (UTIMCO) or other financial managers authorized by the Board. Each proposed gift shall be reviewed to determine whether it should be accepted, including consideration of any required cash expenses, liabilities,

contingent liabilities, unrelated business income taxes, donor requirements that may result in risk of loss, and other sources of funds available to cover expenses and liabilities. This review process shall determine whether the economic risks are appropriate prior to acceptance of the gift. Examples of assets requiring review include limited partnership interests, stock of closely-held corporations, stock of S Corporations, stock options, warrants, and intellectual property.

4.4 Unrelated Business Income Tax.  Assets to be processed or administered by the ODGPS that create potential unrelated business income tax liability must be reviewed by the ODGPS and the institution's chief business officer (CBO) in conjunction with UTIMCO for economic implications and by the Office of General Counsel (OGC) for legal implications.

4.5 Real Property.  Gifts of real property shall comply with the Board of Regents' *Rules and Regulations*, Rule 60103, Guidelines for Acceptance of Gifts of Real Property and the U. T. System Environmental Review for Acquisitions of Real Property, UTS161. These and additional documents may be found on the Real Estate Office's (REO's) website at http://www.utsystem.edu/reo [3].

4.6 Signatures.  Any gift agreement or other gift documentation to be signed by a representative of the Board shall be signed by a properly delegated representative, after review of the gift as provided in these procedures and any applicable institutional policy.

4.7 Institutional Policies.  The presidents of the institutions must develop and implement Handbook of Operating Procedures policies consistent with these procedures for the review and acceptance of gifts for which responsibility for acceptance has been delegated to presidents.

4.8 Nonconformance with Procedures. Recommendations regarding the acceptance of gifts or other actions that do not conform to these procedures shall be made through the Vice Chancellor for External Relations to the Board after review by appropriate offices of the terms of the gifts, the nature of the donated assets, and/or the requested action.

**Sec. 5 Gift Counting Guidelines.**

U. T. will comply and all gifts will be counted in accordance with Council for the Advancement and Support of Education ("CASE") gift counting guidelines as published in the CASE Reporting Standards & Management Guidelines for Educational Fundraising, 4th edition, and subsequent editions. Before entering into a capital campaign, a U. T. institution must develop written campaign counting guidelines, which conform to CASE. U. T. System will follow CASE standards as the official guide for campaign counting and for reporting progress to CASE and to the public toward institutional campaign goals. This will allow for parity when measuring performance against institutional peers involved in campaigns.

**Sec. 6 Gift Processing.**

6.1 Cooperation. Institution business offices and development offices, the Office of Academic Affairs (OAA), the Office of Health Affairs (OHA), the Office of Business Affairs (OBA), the REO, University Lands (UL), the OER, the ODGPS, and the OGC will cooperate as necessary to process proposed gifts promptly.

6.2 Valuation. Gifts are valued as of the date transferred to the Board in accordance with the provisions of the Code and applicable regulations. The amount received from the sale of a noncash gift may be more or less than the value of the gift.

6.3 Real Property. Gifts of real estate must be reviewed and evaluated by the REO and/or UL as provided in the Board of Regents' *Rules and Regulations*, Rule 60103, Guidelines for

Acceptance of Gifts of Real Property.

6.4 Securities.  Gifts of securities that are donated to an institution must be reviewed and processed by the ODGPS. The Board of Regents' *Rules and Regulations* authorize only certain U. T. System Administration and UTIMCO personnel to purchase, exchange, sell, assign, and transfer securities on behalf of the Board. No other person or entity may execute or instruct others to execute a transaction involving any securities in the name of the Board. When securities are to be given to an institution, the institution shall contact the ODGPS immediately for instructions, even if the gift is for current purpose use at the institution. For current purpose gifts, sale proceeds will be transferred to the institution after receipt and processing by the ODGPS.

Sale of the security will take place as soon as possible after the transfer. The ODGPS will notify the institution of the receipt and sale of securities as early as practicable. Acknowledgment of the gift shall be provided to the donor by the institution that the gift benefits, and will be in compliance with the provisions of the Code and regulations thereunder.

6.5 Gifts of Closely-Held Stock.

(a) An effort should be made to obtain nonbinding repurchase provisions when the gift involves securities for which the donor or related parties are the primary market.

(b) To the extent applicable, the following criteria, in addition to those outlined in Section 6.4 above, must be met for the ODGPS to approve or accept gifts of closely-held stock:

• The ODGPS must assure there is a written gift agreement indicating the donor's intent to make the gift and its purpose.

• Prior to acceptance, the donor must provide to the ODGPS financial and valuation information on the stock, including appraisals and/or statements of value.

- Copies of any applicable shareholder agreements and buy-sell agreements must be provided by the donor for review by the ODGPS, the OGC, and UTIMCO, especially those that include any restrictions on the transfer of the stock, i.e., rights of first refusal, formulas for determining stock price.
- The donor must provide to the ODGPS a written copy of any related offer to purchase the stock, including the purchase price per share.
- The ownership of the stock must be properly assigned by the donor to the Board.

6.6 Gifts of Interests in Limited Partnerships.

(a) The ODGPS or the institution's president, as appropriate, may accept gifts of interests in limited partnerships, subject to a thorough analysis of all available information by the ODGPS, with the assistance and advice of the institution's CBO, the OGC, and UTIMCO. At a minimum, the U. T. System Administration should receive copies of the limited partnership agreement, the proposed assignment of interest, and financial documentation sufficient to describe the assets of the partnership and their valuation.

(b) The ODGPS, the OGC, the CBO, and UTIMCO will analyze a proposed gift of an interest in a limited partnership to confirm that there is a real benefit to be derived by the institution that is commensurate with any potential risks and costs associated with the gift. Among the factors that will be considered are the following:

- The donor's relationship to the institution designated to benefit from the gift, the history of demonstrable charitable intent, and whether the limited partnership is merely a tax accommodation for the donor.
- Administrative obligations to be assumed by the U. T. System, such as monitoring the partnership for

unrelated business income tax.

- Guaranteed annual distribution from the partnership interest sufficient to U. T. to justify the administrative costs or a cumulative payment made in the form of a preferred return before distributions to other partners at the termination of the partnership.
- Whether the partnership agreement provides for a defined distribution/ termination event or date.
- Whether the U. T. System has any obligation to make capital contributions to the partnership.
- Whether the U. T. System would be held liable for debts of the partnership.
- Whether the partnership appears to be adequately capitalized in light of its activities and maintains liability insurance.

(c) All confidentiality requirements must allow release of information as required by the *Texas Public Information Act*.

(d) The U. T. System should receive a full accounting for the partnership annually, as well as copies of any tax returns filed or required to be provided to partners pursuant to the Internal Revenue Code.

6.7 Gifts of Interests in General Partnerships or Joint Ventures.  U. T. will not accept interests in general partnerships or joint ventures due to the State constitutional limitations on incurring State debts and the risk of future liability or debt.

6.8 Gifts of Personal Property (Other than Outdoor Works of Art).  Gifts of personal property, other than outdoor works of art, donated to an institution must be reviewed for approval and processed by the ODGPS prior to acceptance only if used to establish or make additions to an endowment or charitable remainder trust. Gifts of outdoor works of art must comply with Board of Regents' *Rules and Regulations*, Rule

<u>60101</u> [2], Section 4.1.

6.9 In some instances, gifts are made to U. T.-affiliated external entities for benefit of the U. T. System Administration or a U. T. institution. Such gifts include charitable gift annuities, those that must be given to a 501(c)(3) organization, or others that the Board, as a state agency, cannot accept or process. Such gifts must be handled exclusively by the external entity, from deposit of the funds to acknowledgment. Any gift agreement, receipt or other gift documentation must be signed by an authorized representative of the external entity. No member of the staff of any U. T. institution has the authority to accept gifts made to an external entity.

**Sec. 7 Current Purpose Gifts.**

In general, current purpose or expendable gifts are accepted by the institution president, or his/her designee, or by the Chancellor, or his/her designee, for such gifts made to U. T. System Administration. Exceptions include, but are not limited to, marketable and closely-held securities, partnership interests, and real property. These gifts must be reviewed, evaluated, and processed by the appropriate U. T. System office as set out in Sections 4 and 6. Current purpose gifts of real property are accepted by the Executive Director of Real Estate. Gifts of securities are accepted by the ODGPS via delegated authority from the respective institution president. For further information regarding the acceptance process for current purpose gifts, please contact the ODGPS.

**Sec. 8 Gifts of Personal Property.**

U. T. may consider gifts of personal property, which can be tangible or intangible. Gifts of personal property, other than outdoor works of art, given for current purpose use are accepted by the U. T. institution president, or his/her designee. Exceptions include, but are not limited to,

marketable and closely-held securities and limited partnerships, which must be reviewed, evaluated, and processed by the appropriate U. T. System office. In addition, OER and ODGPS have exclusive authority to handle matters related to estates and trusts, including those that provide for a current use gift for a U. T. institution. The Development or University Advancement Office at each U. T. institution must be made aware of all personal property gifts, also known as gifts-in-kind. The president or chief development officer shall provide instructions to staff campus-wide regarding proper procedures for handling gifts of personal property. The U. T. institution must agree to be responsible for any carrying costs associated with the gift (e.g., the cost of insuring a gift of art that will be retained). The IRS requires that donors seeking to claim a charitable tax deduction for a personal property gift with a fair market value in excess of $5,000 obtain a qualified appraisal. To avoid any conflict of interest, a U. T. institution can neither pay for nor reimburse a donor for his or her appraisal costs. The qualified appraisal must be completed no earlier than 60 days prior to the date of the gift and must be received no later than the date of the filing of the donor's gift tax return for the year of the gift. If no appraisal is required for the donor's purposes, a U. T. institution may seek its own independent appraisal of the property. In such case, the U. T. institution will bear all costs of the appraisal for U. T. institution purposes only.

Appraisals are not required for gifts of $5,000 and less, but the donor may obtain a qualified appraisal if he or she chooses. The institution may value the gift based on the donor's appraisal, a value declared by the donor (a copy of either a paid bill of sale or invoice and a copy of a check or credit card statement showing payment is recommended), or

a value determined by a qualified expert on the faculty or staff of the institution. This value should be used for the institution's purposes only.

IRS Form 8283, Noncash Charitable Contributions, is required to be submitted to the donee organization for signature when the donation is greater than $5,000 and consists of property other than publicly traded securities. It is the responsibility of the donor to complete all applicable sections of the form except for the Appraiser and Donee acknowledgement sections. Once the donor has completed the applicable sections, the form should be submitted to the appropriate U. T. institution officer, as set out in the U. T. institution's Handbook of Operating Procedures, for completion of the Donee acknowledgement section.

IRS Form 8282, Donee Information Return, is required to be completed by a donee that sells or disposes of a non-cash gift within three years of the receipt of the donation by the organization. This includes any donated property (other than money or publicly traded securities) if the claimed donation value exceeds $5,000 per item or group of similar items donated by the donor to one or more donee organizations. The term "gift-in-kind" is generally used for personal property, both tangible and intangible, that will be retained and used by a U. T. institution, rather than sold. Retained property must complement the core mission of the U. T. institution. Gifts in kind shall be valued at their full fair market value. Gifts with fair market values in excess of $5,000 will be reported at the values placed on them by qualified independent appraisers as required by the IRS. Gifts of $5,000 and under may be reported at either the value declared by the donor or the value placed on them by a qualified expert on the faculty or staff of the U. T. institution. If a price is not determined, the value shall be recorded at

$1.

Examples of tangible assets include, but are not limited to:
• personal collections of art, books, coins or movies;
• animals, such as livestock;
• cars, boats and aircraft;
• equipment;
• developed software;
• printed materials; and
• food or other items for hosting dinners.

Examples of intangible assets include, but are not limited to, various intellectual property such as:
• patents;
• copyrights of cultural, artistic and literary works; and
• computer software under development.

For equipment and software gifts, report the educational discount value if one is offered, i.e., the value the U. T. institution would have paid had it purchased the item outright from the vendor. Many software donations are licenses and are not be considered as gifts. The U. T. institution must ascertain whether the software is a gift, partial interest or exchange transaction according to the IRS. Partial interests and exchange transactions are not gifts and, therefore, are not countable/reportable. A donor must irrevocably transfer ownership of the property to a U. T. institution for the property to be considered a gift.  Gifts of hardware and software may only be counted if they are irrevocable.

**Sec. 9 Gifts to Establish Permanent Endowments Held and Administered by the Board of Regents.**

Endowments will be established with gifts that have been completed for tax purposes or with a combination of such gifts, pledges, and other funds at a minimum funding level of $10,000. Endowments may be established to fund scholarship programs and other educational activities as well as the endowed academic positions specified in the Board of

Regents' *Rules and Regulations*, Rule 60202 [4] concerning endowed academic positions. All endowments must be reviewed and approved by the ODGPS and must meet minimum funding levels as set out in Board of Regents' *Rules and Regulations*, Rule 60101 [2] and Rule 60202 [4]. With the approval of the appropriate Executive Vice Chancellor and Vice Chancellor for External Relations, each institution may set minimum funding levels that are higher than those set by the Board. The required minimum funding level will be determined by the total value of gifts from donors and transfers of funds, valued as of the gift date or date of transfer, respectively. Reinvestment of endowment distributions, which would be considered a transfer of funds, may be used to determine the total funding value. Example:  A donor contributes $20,000 a year for five years to fund a professorship at a total contribution value of $100,000. At the end of the five-year period, the endowment may have reached a market value of $250,000 due to capital appreciation. However, the contributed value remains at $100,000. This endowment cannot be redesignated as a distinguished professorship until the contribution amount reaches $250,000 from additional gifts or transfers of funds. Negotiations and fundraising for an endowment are permitted prior to its formal approval and establishment by the Board or its designee(s). However, an endowment will not be announced as having been established prior to its approval by the Board or its designee(s). New endowments shall not be created and existing endowments shall not be increased using accumulated distributions from existing permanent endowments. However, under rare and special circumstances, such distributions may be used to create or add to an endowment with the approval of the Vice Chancellor for External Relations, provided the terms of the

new endowment(s) are consistent with the terms of the endowment agreement governing the existing endowment.

9.1 Endowment Agreements.

(a) A written endowment agreement signed by the donor(s) is required for each new permanent endowment established. (See Item 5 for sample endowment agreements.) This instrument must, absent compelling reasons, include the following language:

• donor name(s);
• gift description and/or amount;
• pledge description, amount, and due date;
• endowment name;
• college, school, and/or department to benefit;
• a statement setting out the intended use or purpose for funds distributed from the endowment;
• a statement that the funds shall never become a part of the Permanent University Fund, the Available University Fund, or the General Fund of the State of Texas;
• a statement that, in the opinion of the Board, if (a) a restriction contained in the endowment has become impractical or wasteful, or it impairs the management or investment of the fund, or, because of circumstances not anticipated by the donor, a modification of the restriction will further the purposes of the fund or (b) a restriction contained in the endowment on the use of the fund becomes unlawful, impracticable, impossible to achieve, or wasteful, the Board may modify the restriction or purpose of the endowment to further the purposes of the fund in a manner consistent with the original charitable purpose expressed in the endowment;
• a statement providing that all future additions to the endowment, including those made by the Board or the

institution administration, shall be subject to the provisions of the endowment agreement and shall be classified as permanent endowment funds; and

• other provisions the responsible development officer and the ODGPS determine are necessary or appropriate.

(b) In cases where an endowment is established pursuant to an institution's solicitation or campaign, the solicitation letter or document sent to prospective donors may be used as the endowment agreement to evidence the donative intent and purposes. If the solicitation materials do not contain the provisions required in bulleted paragraphs above, a separate gift agreement memorandum containing the required provisions and signed by the appropriate institution representative should be provided to the ODGPS by the U. T. personnel responsible for the solicitation.

(c) A gift agreement memorandum should also serve as the endowment agreement in situations where funding is from multiple donors with no primary donor or donors. (See Item 5 for a sample endowment agreement entitled "Newly Created Endowment with Multiple Donors.")

9.2 Custody of Assets.  The assets donated to fund a new endowment may be delivered to the ODGPS or UTIMCO for custody and investment by UTIMCO pending acceptance. A request for acceptance of the endowment should be submitted to the ODGPS by the institution as soon as possible after delivery of the assets. Once an endowment has been officially established, the donated assets must be delivered to the ODGPS or UTIMCO as soon as possible for custody and investment by UTIMCO.

9.3 Selection Criteria for Scholarship and Fellowship Recipients.

(a) A donor may specify or require that

• the scholarship or fellowship be for institution-wide use;

- the recipient be registered in a particular college, school, or department within the institution or the recipient be limited to students studying in a specific academic major or a certain area of study or concentration;
- the recipient have a specified class standing or have completed a specified number of semester hours of college work;
- consideration of recipients be conditioned on academic performance;
- consideration of recipients be based on financial need;
- a preference be exercised in association with the renewal of the award;
- recipients be students from a particular geographic area (city, school district, county, or state). The population of U. T. students from the named geographic area should be large enough to allow for consistent use of the scholarship and to avoid an allegation that the funds were "targeted" to a particular individual or individuals;
- the recipient be a U.S. citizen or legal resident of the United States. Any gift to be designated for U.S. citizens must also include permanent residents as federal courts have ruled that state entities must give equal consideration to U.S. citizens and to individuals admitted to permanent residency; or
- recipients have received part or all of their preparatory education from a particular geographic area or region outside of the U.S. It is generally illegal to give or deny benefits based on a person's national origin. Therefore, requiring recipients to be from a particular country is not permissible.

(b) If consistent with the Board of Regents' *Rules and Regulations*, U.S. Department of Education regulations, Office of Civil Rights recommendations, and interpretations

of the Texas Higher Education Coordinating Board, the donor may specify certain other selection criteria as a preference for recipient selection, but not as a restriction. U. T. will make reasonable efforts to honor preferences specified by a donor as provided in this paragraph; however, as provided by applicable law, no person shall be excluded from participation in, denied the benefits of, or be subject to discrimination under, any program or activity sponsored or conducted by the U. T. System Administration or any U. T. institution, on the basis of race, color, national origin, religion, sex, age, veteran status, or disability. It is not appropriate to provide scholarships based on a student's position on a political or social issue.

(c) Endowed scholarship or fellowship awards should be based on the funds distributed from the endowment, rather than a specific amount. The size and number of awards will be determined by the appropriate scholarship committees at the institution or under the scholarship program applicable to the endowment. Scholarship or fellowship amounts may also be referred to in more general terms such as "tuition and required fees" in the endowment agreement.

(d) The IRS will not recognize a contribution for charitable tax deduction if the donor retains control over the gift funds or how they are used. In accordance with that understanding, the donor may not participate in the final selection of scholarship recipient(s), name a non-U. T. employee to any final selection committee, or structure the criteria so narrowly as to limit selection to a small population comprised solely or primarily of individuals related to the donor or that the donor would choose. In rare and special circumstances, such as gift funds contributed by a foundation, an exception to this provision may be granted by the Vice Chancellor for External Relations.

9.4 Endowed Academic Positions.  There are six categories of endowed and named academic positions with minimum funding levels as set forth in Board of Regents' *Rules and Regulations*, Rule 60202 [4]. With the specific approval of the Board, an endowed academic position may be established without the required minimum funding level only in accordance with agreements recommended by the Chancellor, the appropriate Executive Vice Chancellor, and the Vice Chancellor for External Relations.

No initial appointment will be made to an endowed academic position without prior approval as a Request for Budget Change by the president of an institution after review and approval by the appropriate Executive Vice Chancellor. Subsequent new or continuing appointments to endowed academic positions may be approved as a part of the annual operating budget. As the IRS will not recognize a contribution for charitable tax deduction if the donor retains control over the gift funds or how they are used, a donor may not participate in the final selection of the appointment or name a specific individual as the holder of an endowed academic position. In rare and special circumstances, such as gift funds contributed by a foundation, an exception to this provision may be granted by the Vice Chancellor for External Relations.

9.5 Pledge Policy.  Pledges from donors that follow these procedures may be accepted to fund endowments of any level recognized by the Regents' Rules and Regulations.

(a) At least 20% of the donor's total required minimum funding amount prior to the acceptance of an endowment must be received prior to the acceptance of an endowment, i.e., before the endowment will be established.

(b) The pledge for payment of the remaining required minimum funding shall not extend beyond five years after the

date of execution of the endowment agreement; however, with the approval of the Vice Chancellor for External Relations, the pledge period may be longer than five years under rare and special circumstances. A pledge for any amount beyond the required minimum funding is not bound to a five-year pledge period. As an example, for an endowed scholarship that is fully funded with a $25,000 gift, an additional $75,000 pledge may be extended reasonably longer than five years.

(c) All funds that otherwise would be distributed from the endowment will be reinvested as a permanent addition to the endowment until the endowment is funded with the then required minimum funding level for the endowment or is dissolved as provided in Section 8.5(e) below, except in the case of endowed academic positions with the approval of the Vice Chancellor for External Relations or the Vice Chancellor's designee.

(d) Funding levels will not be determined by the amount of net sale proceeds received from a noncash gift or by the current market value of the investment held in an endowment. As an illustration, a donor gives a gift of stock valued at $10,000 to create a new endowment. The stock is sold for net sales proceeds of $9,500. The $10,000 endowment may still be created because the donor contributed a gift valued at $10,000, although the endowment's value is only $9,500.

(e) If the donor is unable to fulfill the pledge by the end of the five-year period, the institution shall notify the ODGPS to determine an appropriate course of action. Typically, the endowment will either be dissolved or redesignated as follows:

• If there are insufficient funds held in the endowment to reach the minimum funding level required for an

endowment, the endowment may be dissolved by the Board or its designee(s) and the president of the beneficiary institution shall have the discretion to designate an existing endowment to which to transfer the funds, or expend the funds for the general purposes of the institution, taking into consideration the original intent.

• If there are sufficient funds held in the endowment to reach the minimum endowment funding level for an endowment, but insufficient funds to reach the required funding level for the endowment as originally established, the endowment may be redesignated to the highest level of endowment category possible based upon the book value of funds held and the original intent, with the approval of the Board or its designee(s).

**Sec. 10 Establishment of Quasi-Endowments Held and Administered by the Board of Regents.**

All quasi-endowments must be reviewed and approved by the ODGPS and must meet minimum funding levels as set out in the Board of Regents' *Rules and Regulations*, Rule 60101 [2] and Rule 60202 [4]. The required minimum funding level will be determined by the total value of transfers of funds to the endowment, valued as of the date of transfer. Reinvestment of endowment distributions may be used to determine the total funding value. An endowment will not be announced as having been established prior to its approval by the Board or its designee(s). New endowments shall not be created and existing endowments shall not be increased using accumulated distributions from existing permanent endowments. However, under rare and special circumstances, such distributions may be used to create or add to an endowment with the approval of the Vice Chancellor for External Relations, provided the terms of the

new endowment(s) are consistent with the terms of the endowment agreement governing the existing endowment. A written agreement, signed by the institution's president or the appropriate dean or department head, is required for each new quasi-endowment established. (See Item 5 for a sample endowment agreement entitled "Newly Created Quasi Endowment.") This instrument will, absent compelling reasons, include the following language, as applicable:
• information and provisions described in Section 8.1; and
• amount and source or description of the funding. Funds must be identified as either restricted or unrestricted.

**Sec. 11 Classification of Endowment Funding.**

11.1 Permanent and Quasi-Endowments.  When mixed sources of funds (both gifts given specifically for endowed purposes and current funds) are used to establish an endowment, separate but related permanent and quasi-endowments will be created. (See Item 5 for a sample endowment agreement entitled "Newly Created Quasi/Perm Endowment.") Each endowment account must be funded with at least the minimum endowment funding level of $10,000, (i.e., there would need to be at least $20,000 total to establish separate endowment accounts). If the endowment is initially funded with less than $20,000 from mixed sources (both endowed and current funds), the entire endowment will be classified as a permanent endowment. When funding permits, a separate but related quasi-endowment shall be created.

11.2 Additional Contributions.  If only a permanent endowment account is in existence at the time of an additional contribution to an endowment established with mixed sources of funds, the institution will review the source(s) and amounts of funds to be added to determine if a separate, but related quasi-endowment account should be established. Administrative approval of the related quasi-

endowment is not needed if there is no re-designation of endowment level or other amendment. Alternatively, if only a quasi-endowment is in existence at the time of an additional contribution, administrative approval of a related permanent endowment is not needed if there is no re-designation of endowment level or other amendment.

11.3 Additional Contributions to Separate Accounts.  If separate permanent and quasi-endowment accounts exist at the time of an additional contribution, the institution will review the source(s) of funds to determine the correct allocation.

11.4 Transfer of Current Funds.  When a transfer of current funds is to be combined with a donor's pledge, the ODGPS will consider the total of the donor's pledge, rather than the amounts of payments received, to determine whether separate permanent and quasi-endowment accounts should be established.

11.5 Reinvestment of Distributions.  Any reinvestment of endowment distributions will be classified in the same manner as the corpus of the endowment.

11.6 Permanent Endowment Funds.  Notwithstanding any of the above, any additional funds from any source will be classified as permanent endowment funds where the existing permanent endowment is governed by a donor-executed endowment agreement that contains language that "all future additions to the endowment, made by the donor or others, including those made by the Board of Regents or the institution, shall be subject to the provisions of the endowment agreement and shall be classified as permanent endowment funds."

**Sec. 12 Investment, Payout, and Reinvestment Policy for Endowments.**

12.1 UTIMCO.  As authorized by law, the Board has contracted with UTIMCO to invest all funds donated to U. T. that are under the sole control of the Board.

12.2 Investment Restrictions.  No matching funds or other funds of U. T. may be held or managed by a party selected by the donor. No endowment shall be accepted in which the donor directs the investment transactions or holdings or may approve investment policy or strategy or on which the donor places any other investment restrictions.

12.3 Standard for Investment Decisions.  The primary and constant standard for making investment decisions for endowments shall be "that standard of judgment and care that prudent investors, exercising reasonable care, skill, and caution, would acquire or retain in light of the purposes, terms, distribution requirements, and other circumstances of the fund then prevailing taking into consideration the investment of all the assets of the fund rather than a single investment."

12.4 Collective Investments.  All endowment gifts should be eligible for commingling for investment purposes with other endowment funds. The Board has established the U. T. System Long Term Fund, governed by and invested according to the U. T. System Long Term Fund Investment Policy Statement, to provide for the collective investment of endowment funds. This commingling permits enhancement of long-term investment programs, affords appropriate risk control through diversification, and provides for optimization of asset mix through time.

12.5 Long Term Fund.  Specific language that allows endowment funds to be invested in the U. T. System Long Term Fund or otherwise pooled for investment purposes should be included in all endowment agreements.

12.6 Agreement Terms.  An endowment agreement shall not include terms regarding endowment payout that conflict with either the payout policies established by the Board or the payout provisions of the Texas Uniform Prudent

Management of Institutional Funds Act, as amended.

12.7 Charge of Certain Expenses.  To acknowledge the Board's ability to charge certain expenses against the endowment funds for administration, management, and compliance, the endowment agreement should specify one of the following:

(a) donor(s) acknowledge(s) and agree(s) that in connection with administration and management of the endowment funds, the Board may charge certain expenses against the endowment funds for administration, management, and similar charges; or

(b) the Board may not charge certain expenses against the endowment for administration and management.

12.8 Management of Payout and Reinvestment.  To ensure the Board has the ability to manage payout and reinvestment policies, the endowment agreement should specifically allow the following:

(a) funds distributed during a year may be retained by the institution and expended for the purposes of the endowment in subsequent years; and

(b) the reinvestment of some portion of the payout as a permanent addition to the principal of the endowment at the discretion of the Board or institution's administration.

12.9 Endowments Funded with Mineral Interests in Real Property.  In accordance with the *Texas Trust Code* and the *Uniform Principal and Income Act* (UPIA), a certain percentage of mineral royalty proceeds must be allocated to endowment principal. Because complex and numerous depletion calculations would be required to determine the correct amount to allocate to endowment principal and consistent with requirements for the Permanent University Fund, 100% of mineral royalty proceeds, including bonuses, rentals, and royalties, should be allocated to principal for

ease of administration. An institution may request a lesser allocation of principal by submitting a written request to the ODGPS. Such request must be reviewed and approved by the UL in consultation with the ODGPS and the OGC.

**Sec. 13 Amendment or Termination of Endowments.**

13.1 Authorization for Changes.  Once a permanent endowment is created, the terms, purpose, or existence of that endowment may be changed only if authorized by the terms of the endowment agreement, Board policy, or applicable laws.

13.2 Review of Amendments.  Any request received or initiated by an institution to amend the terms or purpose of a permanent endowment or to terminate an endowment must be sent to the ODGPS for review and approval with the legal advice of the OGC. The OGC will determine whether the endowment may be modified judicially or nonjudicially pursuant to the Texas Uniform Prudent Management of Institutional Funds Act or *Texas Education Code* Section 65.36(f).

13.3 Requests to amend or terminate a quasi-endowment must be sent to the ODGPS for review and approval. Upon termination of a quasi-endowment, the ODGPS will coordinate the disbursement of the endowment's proceeds with UTIMCO.

**Sec. 14 Endowments Held and Administered by External Trustees.**

U. T.'s interest in any endowment held and administered by an external trustee must be reviewed and approved by the ODGPS.

In addition to provisions set out in Sections 8, 9 and 12 above, to the extent practicable, the Board requires the following for endowments held and administered by external trustees.

14.1 Endowment Agreements.  A written endowment agreement signed by the donor(s) is required for each

endowment.  Endowments held and administered by U. T.-affiliated external foundations must, absent compelling reasons, include language as set out in Section 8.1 above consistent with Board-held endowments.

14.2 Distributions.  A predictable stream of distributions from an endowment held by an external trustee, consistent with the Board's endowment payout policy and not in conflict with the payout provisions of the *Texas Uniform Prudent Management of Institutional Funds Act*, as amended. U. T. System Administration prefers that any U. T. institution receives such payout on a quarterly basis, but no less often than annually.

14.3 Appreciation.  That all appreciation from an endowment held by an external trustee be maintained in the endowment, except that distributed for the purpose(s) of the endowment.

14.4 Annual Reports.  That the external trustee provides annual reports to the ODGPS that detail the value of the assets of the endowment and the annual receipts and expenditures.

14.5 Accounting Records.  That separate accounting records be maintained for each such endowment so that investment performance can be accurately analyzed over time.

14.6 Appointments to Endowed Academic Positions.  That all appointments to endowed academic positions be selected by the institution.

14.7 Acceptance of Interest.  That a request for acceptance of U. T.'s interest in the endowment be submitted by the institution to the ODGPS as soon as possible after delivery of the gift to the external trustee or notification by the external trustee that the endowment has been established.

**Sec. 15 Planned Gifts.**

15.1 Solicitation and Negotiation.

(a) The OER, the ODGPS, and the OGC must review and approve

- an initial or new advertisement or planned giving brochure; and
- an existing advertisement or planned giving brochure that has been materially modified since last approved by the OER, the ODGPS, and the OGC to be mailed or otherwise furnished to potential donors before distribution to donors. Minor modifications to existing planned giving advertisements or brochures require review by the ODGPS prior to distribution to potential donors.

(b) Negotiation, execution, and acceptance of any planned gift shall follow procedures outlined in these procedures. All agreements shall include language previously approved by the OGC unless otherwise approved in accordance with the processes set forth in these procedures.

(c) It is the responsibility of each U. T. representative to keep detailed written notes to supplement written correspondence to demonstrate ethical practices in negotiations with each donor.

(d) The institution's representative working with a donor who desires to make a planned gift shall contact the ODGPS as soon as the institution's representative becomes aware of the potential gift.

(e) Payout rate guidelines for charitable remainder trusts are provided below in Section 15.4(d) for use by all U. T. staff members authorized to enter into negotiations concerning planned gift agreements to assist them during discussions with donors.

(f) Donors should be informed that payout rate guidelines may be adjusted if market conditions change significantly before an agreement is finalized.

15.2 Restrictions on Acceptance of Planned Gifts and Donated Assets.

(a) In accordance with Texas law, the Board cannot accept gift annuities and deferred gift annuities. Inquiries concerning gift annuities and deferred gift annuities will be referred to appropriate external foundations established to benefit the U. T. System or U. T. institutions.

(b) Consistent with Board policy, the Board may serve as trustee of trusts for which the donor retains the right to change the charitable beneficiary only if:  (a) U. T. System or U. T. institution(s) will receive irrevocably at least 50% of the total funding of the trust; and (b) the value of the U. T. System or institution's irrevocable interest equals the minimum requirements established below in Section 15.4(d) for accounts that cannot be pooled for investment purposes.

(c) Consistent with Board policy, the Board may serve as trustee of trusts that allow for invasions of principal only if:  (a) the standards for invasion of principal are objective and nondiscretionary; (b) the U. T. System or institution will receive irrevocably at least 50% of the total funding of the trust; and (c) the value of the U. T. System or institution's irrevocable interest equals the minimum requirements established below in Section 15.4(d) for accounts that cannot be pooled for investment purposes. To avoid conflicts of interest, the Board will not serve as trustee of a trust that allows income beneficiaries to invade the principal of the trust at the discretion of the trustee.

(d) Consistent with Board policy, the Board may serve as trustee of a charitable remainder trust with multiple charitable remainder beneficiaries only if:  (a) the U. T. System or institution will receive irrevocably at least 50% of the remainder; (b) the value of the U. T. System or institution's interest will be at least the minimum trust gift levels established below in Section 15.4(d); and (c) the other charities agree to provisions deemed appropriate by the

148

OGC.

As an example, a donor may fund a charitable remainder trust with assets that may not be pooled for investment purposes, such as real estate or restricted stock, name the Board as trustee and a 50% irrevocable remainder beneficiary for further benefit of one or more institution(s), and name a non-U. T. institution(s) as 50% remainder beneficiary(ies). In this instance, the Board would accept trusteeship if the trust terms were acceptable and the trust was funded at a minimum gift level of $100,000.

(e) To avoid conflicts of interest and to avoid liability issues, the Board cannot serve as the guardian of a person, or as an executor or administrator of an estate.

(f) Consistent with the Code and related regulations, the Board will not accept a planned gift that is known to have the potential to create unrelated business income tax liability for a charitable remainder trust.

(g) In accordance with the provisions of the Code and related regulations, the Board will not accept stock in an S Corporation to fund a charitable trust without the written consent of all other shareholders.

15.3 Management and Investments.

(a) The ODGPS is not authorized to administer or manage trusts of which the Board is not trustee.

(b) The U. T. System may request reimbursement from charitable trusts of which the Board is trustee for any third party charges incurred by the trust. Such charges may include, but are not limited to, bank custodial fees, real estate expenses such as appraisals, surveys, environmental assessments, maintenance and repairs, and legal fees. In circumstances where it is deemed inappropriate for the affected trust to bear such expenses, the institution shall reimburse the trust. If multiple institutions are involved, then

such costs shall be shared pro rata.

15.4 Types of Planned Gifts.

(a) Wills and Bequests.

- When an institution is notified of the death of a person who has named the U. T. System or an institution as a beneficiary, the ODGPS must be notified immediately and forwarded copies of all available documentation and correspondence. If the ODGPS is notified of the death of a person who has named the U. T. System or an institution as a beneficiary, the ODGPS shall promptly notify the beneficiary of the bequest. The OER and the ODGPS have exclusive authority to handle matters related to estates benefiting U. T., including authority to sign partial or complete releases of liability, and will be responsible for promptly supplying documentation to other U. T. System Administration offices as appropriate.

- The ODGPS will provide instructions to estate executors and administrators regarding the disposition of estate assets bequeathed to U. T. All estate distributions will be transmitted as directed by the ODGPS. Any tangible personal property not liquidated by the executor should be shipped directly to the institution. Unless otherwise requested by the institution, the ODGPS will promptly transmit any bequests designated for use as current funds to the institution.

- Any U. T. employee who agrees to serve as executor or administrator of an estate that benefits U. T. System or an institution must immediately notify the ODGPS of his or her appointment. Upon notification, the employee will be furnished a statement advising of the potential for conflicts of interest and directing that all communications pertaining to the estate between the

employee and any office of U. T. System Administration or the institution shall be in writing.

- Employees of U. T. should not knowingly act as witnesses to wills in which U. T. System Administraiton or an institution is named as a beneficiary.
- U. T. will not draft wills and other documents for donors, but, when appropriate, may provide sample language for the donor's consideration.
- If an individual provides a copy of the individual's will to a U. T. employee and the will names U. T. System Administration or an institution as a beneficiary, the institution will promptly send a copy of the will to the ODGPS for review. As necessary, and at the discretion of the ODGPS, the ODGPS will furnish copies to the OGC and the institution development office for further review. Any U. T. employee to whom an individual's will is furnished must protect the confidentiality of its contents to the extent allowed by law.

(b) Charitable Remainder Trusts Held and Administered by the Board.

- All charitable remainder trusts for which the Board would be the trustee must be reviewed by the ODGPS, UTIMCO, and the OGC. A charitable remainder trust of which the Board is proposed to be trustee should have no more than two income beneficiaries, the youngest of which is at least 55 years of age. A term charitable remainder trust (not to exceed 20 years) may have income beneficiaries of any age and is not limited to two income beneficiaries.
- If the charitable remainder trust (a) has acceptable terms, (b) is funded with cash or marketable securities, and (c) may be pooled for investment purposes, the trust must be initially funded at a minimum gift level of

$50,000.
- If the charitable remainder trust (a) has acceptable terms, and (b) is funded with assets that may not be pooled for investment purposes, the trust must be initially funded at a minimum gift level of $100,000.
- A unitrust with a net income payout or net income with make-up provision payout should be established for trusts funded with assets other than cash or marketable securities. Other acceptable terms depend upon the standard criteria plus the ability and length of time required to liquidate or manage the asset used to fund the trust.
- The Board will not serve as trustee of charitable remainder trusts funded in whole or in part with real property. However, the Board may serve as successor trustee of such a trust after the real estate is liquidated. U. T. staff will recommend that the donor or other individual or external entity serve as initial trustee and may provide information to the donor on non-U. T. institions in the donor's locale that may serve as trustee.
- The following are the recommended maximum payout rates for charitable remainder trusts for which the Board would be the trustee:

For annuity trusts and straight unitrusts with income beneficiaries:

| Ages 55 to 69 | 5% |
| Ages 70 to 79 | 6% |
| Ages 80 and above | 7% |

For net income unitrusts with income beneficiaries:

| All ages | 5% |

For term charitable remainder trusts:  7%

- Exceptions to Section 15.4(b) must be reviewed by the ODGPS and UTIMCO and approved by the Vice Chancellor for External Relations. Exceptions related to trusts containing real estate must first be reviewed and approved by the Executive Director of Real Estate.
- The annuity payout may not be less than 5% nor more than 50% of the initial fair market value of the property placed in the charitable remainder annuity trust. Also, the remainder interest must be at least 10% of the initial fair market value of all property placed in the annuity trust.
- The unitrust payout may not be less than 5% or more than 50% of the fair market value of the assets, valued annually, of the charitable remainder unitrust. Also, the remainder interest of each property contribution to the unitrust must be at least 10% of the net fair market value of such property as of the date of contribution to the trust.
- A request for acceptance must be submitted by the institution to the ODGPS as soon as possible after receipt of the gift.

(c) Charitable Trusts Held and Administered by External Trustees.

- Any U. T. employee who agrees to serve as trustee of a trust benefiting U. T. System Administration or an institution must immediately notify the ODGPS of his or her appointment. Upon notification, the employee will be furnished with a statement advising of the potential for conflicts of interests and directing that all communications pertaining to the trust between the employee and any office of U. T. System Administration or the institutions shall be in writing.
- All charitable remainder trusts for which the Board would

be the successor trustee must be reviewed by the ODGPS, UTIMCO, and the OGC. Donors who name the Board as successor trustee of a charitable remainder trust should be advised in writing that the Board will review the terms of the trust, the most recent financial statement, and all tax filings for the trust at the time of succession, and determine then whether or not it will serve as successor trustee.

- The external trustee must provide annual reports to the ODGPS that detail the value of the assets of the trust and the annual receipts and expenditures.

- A request for acceptance must be submitted by the institution to the ODGPS as soon as possible after receipt of the gift. Revocable interests will not be accepted.

(d) Charitable Lead Trusts.

- The Board may be designated as a beneficiary of a charitable lead trust if other criteria of this policy are met, but to avoid conflicts of interest, the Board will not serve as trustee of a charitable lead trust. Upon request, U. T. personnel may provide information to the donor on non-U. T. institutions in the donor's locale that may serve as a trustee.

- Consistent with Board policy, a predictable stream of income from a charitable lead trust of which U. T. System Adminstration or an institution is named as a beneficiary is preferred.

(e) Gift Annuities.  Since the Board cannot accept gift annuities and deferred gift annuities, these types of gifts may be referred to The University of Texas Foundation, Inc. [5] for the benefit of U. T.

(f) Gifts of Retirement Plan Assets.  The ODGPS or the institution's president, as appropriate, may handle gifts of

retirement plan assets, such as IRAs and qualified pension or profit sharing plans, which name the Board as beneficiary, including processing remaining assets, and may execute all necessary documents. UT representatives should provide appropriate language for beneficiary designation forms to ensure proper and prompt receipt of assets. All retirement plan beneficiary designations should be made to the "Board of Regents of The University of Texas System for benefit of [the applicable UT institution]. This gift shall be used for the further benefit of the [specify] college/school/department and shall be used to [specify purpose]." A U. T. institution may be a primary or secondary beneficiary. If the latter, the designation is contingent as the gift depends on the occurrence of another event. A copy of the beneficiary designation form or the portion of the beneficiary designation that pertains to the U. T. institution or other documentation showing the U. T. institution's interest should be requested. A current statement of value from the account or a statement of value signed by the donor may also be requested. Such gifts are revocable.

(g) Life Insurance.

• The ODGPS or the institution's president, as appropriate, may accept gifts of life insurance policies naming the Board as owner and beneficiary and may execute all necessary documents.

• All life insurance beneficiary designations should be made to the "Board of Regents of The University of Texas System for benefit of [the applicable U. T. institution]. This gift shall be used for the further benefit of the college/school/department and shall be used to [ specify purpose]."

• An existing or new life insurance policy may be accepted if the donor names the Board or a U. T. institution as both

the irrevocable owner and beneficiary.

- The beneficiary institution is responsible for preserving the value of a life insurance policy owned by the Board pursuant to institution guidelines. The guidelines should cover situations in which the insurance policy is not paid-up and does not have any source of funds for payment of the premiums identified at the time of the gift or thereafter.
- Donors may make additional gifts to pay the premium of permanent policies that are not paid in full. Outright gifts made to a U. T. institution to pay the premiums on these policies may be accepted. If the donor/insured fails to make a gift of a premium payment to a U. T. institution in advance of the premium due date, the U. T. institution, as owner of the policy, reserves the right to cash in the policy or to pay the outstanding premium from policy cash values or from institutional funds.
- When a donor indicates he or she has named the Board or a U. T. institution as beneficiary of a life insurance policy, a copy of the beneficiary designation form or the portion of the beneficiary designation that pertains to the U. T. institution or other documentation showing the U. T. institution's interest should be requested. A current statement of value from the insurance carrier or statement of value signed by the donor should also be requested.
- When a donor names a U. T. institution as beneficiary of a life insurance policy, but does not transfer ownership of the policy, he or she has made a revocable gift. Such a gift is an expectancy. If a U. T. institution is named a secondary beneficiary, the expectancy is contingent as the gift depends on the occurrence of another event.
- U. T. institution group life insurance policies may not be

assigned to U. T. System or a U. T. institution, nor may U. T. System or a U. T. institution be named a beneficiary of such policy. A donor may name The University of Texas Foundation, Inc. for benefit of a U. T. institution as the beneficiary of U. T. group life insurance.

- U. T. System has chosen not to endorse any formal charitable life insurance programs or products.

(h) Pooled Income Fund.

- Gifts to the U. T. System Pooled Income Fund may be accepted only if the beneficiaries are age 55 or older and there are no more than two income beneficiaries for each account established in the Fund. The minimum gift needed to enter the Fund is $10,000 or a contribution of $5,000 with a pledge that additional contributions will be made to bring the total dollar share in the Fund to $10,000 within five years.
- All gifts must be made in cash or readily marketable securities.
- A request for acceptance must be submitted by the institution to the ODGPS as soon as possible after receipt of the gift.

(i) Gift of a Remainder Interest in Real Property with Retained Life Estate.

- U. T. will not accept a gift of a remainder interest in a personal residence with a life estate reserved by the donor. However, under rare and special circumstances, the Executive Director of Real Estate may grant an exception and allow the REO to review, process and approve such a gift. A request for acceptance of U. T.'s remainder interest in the property must be submitted by the institution to the ODGPS.
- A gift of a remainder interest in a vacation property, farm,

157

or ranch with a life estate reserved, must be reviewed, evaluated, and approved by the REO and the OGC and processed by the REO and the ODGPS prior to acceptance.

• A gift of a testamentary remainder interest in a personal residence, vacation property, farm, or ranch with a life estate reserved will be reviewed and evaluated by the REO. A decision as to whether to accept or disclaim the gift will be made by the REO in consultation with the OGC, the ODGPS, and the institution.

• While the life estate exists, the donor(s) or life tenant(s) will be responsible for all expenses of maintenance, taxes, and insurance. At the time the remainder interest is conveyed to U. T., the donor must sign a separate life estate agreement with the Board to clarify responsibility for maintenance, taxes, insurance, and other issues during the term of the life estate. See Item 5 for a sample form of Life Estate Agreement.

• The REO will coordinate with the benefiting institution to schedule visits with the donor(s) or life tenant(s) at the property. Such visits should take place at least annually.

(j) Bargain Sale.

• An individual may transfer an asset to the Board for benefit of an institution and receive less than the fair market value in return. Typically, bargain sales involve the transfer of appreciated property.

• The ODGPS, the OGC, the CBO, and the REO, if applicable, shall analyze a proposed bargain sale to confirm it is in the best interest of the institution.

(k) Timeshares

• U. T. will not accept gifts of timeshares.

• A testamentary gift of a timeshare will be disclaimed when

possible.

**Sec. 16 Gifts Related to Namings of Facilities and Programs.**

Any naming of facilities and programs must follow the Naming Policy as set out in Board of Regents' *Rules and Regulations*, <u>Rule 80307</u> [6]. Facilities and programs may be named to memorialize or otherwise recognize substantial gifts and significant donors or individuals designated by donors. Each institution shall develop guidelines for what constitutes substantial and significant donations to warrant a gift-related naming, which must be approved by the Executive Vice Chancellor for Academic or Health Affairs, the Vice Chancellor for External Relations, and the Vice Chancellor and General Counsel.

A written gift agreement signed by the donor(s) is required for each gift-related naming. The OER must be furnished with a fully signed copy of the gift agreement for every gift-related prominent naming. The agreement must, absent compelling reasons, include the following language:

• donor name(s) and address;
• gift description and/or amount;
• pledge description, amount, and due date, which shall not extend beyond five years after the date of execution of the gift agreement;
• name of the institution receiving the gift and/or pledge;
• a statement setting out the intended use or purpose of the gift;
• the proposed naming of the facility or program;
• a statement anticipating changes of circumstances, such as changes in the donor's gift intentions or changes to the facility or program as determined by the Board, thereby allowing for an alternative recognition or removal of the naming; and
• a termination provision that contemplates the unlikely event of a change in circumstances whereby the public image

159

of the donor conflicts with the purpose or mission of the Board or institution or would disparage, impair, or adversely impact the reputation, image, or integrity of the Board or institution in the event of a continued association with donor and the continuation of the naming.

The OER shall provide sample gift agreements to each institution and will review draft agreements prior to execution by the donor and the institution. In the case of a prominent facility or program corporate naming, the institution shall negotiate an agreement with the corporation using the Standard Corporate Naming Gift/Licensing Agreement prepared by the OGC. Any substantive variations to these gift agreements must be approved by the OER and the OGC. If the donor presents a gift agreement for use, its terms must be reviewed by the OER and the OGC to ensure the agreement contains all essential elements as set out above. See sample forms of Gift Agreement for Individual Prominent Facility Naming; Corporate Gift Agreement for Naming of Prominent Facility or Program; Corporate Gift Agreement for Naming of a Less Prominent Facility; and Corporate Gift Agreement for Naming of a Less Prominent Program.

Donors shall demonstrate reasonable and timely pledge payments before a naming is affixed. After a naming is attached, donors will continue pledge payments in accordance with the terms of the gift agreement. The institution shall inform the OER in writing if pledges are not paid on schedule. Upon receipt of such notification, the OER will consult with the institution to determine an appropriate course of action.

Under rare and special circumstances and with the approval of the Vice Chancellor for External Relations, the pledge

period may be longer than five years. Removal will be addressed in the gift agreement.

**Sec. 17 Corporate Gifts Related to Website Sponsorships.**

Acknowledgment of a gift by posting a company logo on an institution's website must comply with the terms and conditions of the institution's policy on website solicitations and U. T. System Guidelines for Web Site Solicitations. Board of Regents' *Rules and Regulations*, Rule 80103 [7] provides broad authorization for the placement of hypertext links to other websites from U. T. web pages, in accordance with U. T. System and institution guidelines that set forth the restrictions necessary to preserve the space so created for its intended purpose of acknowledging sponsorship, generating revenue, or avoiding costs.

A sample Corporate Gift Agreement Website Sponsorship shall be provided to each institution. The Executive Vice Chancellor for Business Affairs must preapprove both Exhibits A and B of the agreement. Any substantive variations to this agreement must be approved by the OER and the OGC. See sample form of Website Sponsorship Gift Agreement.

**Definitions**

Administrative Approval Process - the procedure for accepting gifts to be approved by the Vice Chancellor for External Relations or his/her designee and that conform to U. T. System Board of Regents' policy.

Available University Fund (AUF) - distributions from the Permanent University Fund.

Bargain Sale - when an individual transfers an asset to charity and receives less than the fair market value in return.

Book Value - as pertaining to an endowment, the book value is the original value of all gifts and contributions made to the endowment, as well as reinvestment of earnings and any realized gains or losses resulting from the sale of noncash

gifts.

Charitable Lead Trust - a trust in which distributions are paid to one or more qualified charities for a certain period of time, after which the charitable interest terminates and the trust remainder typically reverts to designated non-charitable beneficiaries.

Charitable Remainder Trust - a tax-exempt trust that provides for payment to non-charitable beneficiaries for life (or lives), or a term-of-years not to exceed 20 years, after which the trust remainder goes to one or more qualified charities.

Closely-Held Stock - a corporation the stock of which is held by a few shareholders, often the management or the members of a family. Some closely-held stock is publicly traded. Closely-held stock of a "closed corporation" is not publicly traded.

Completed Gifts - generally, a gift is complete when the donor has parted with dominion and control over the transferred property or property interest, as in the unconditional delivery of the gift to the donee or the donee's agent, leaving the donor without the power to change its disposition, whether for the benefit of the donor or for the benefit of others. A gift that is subject to conditions may not amount to a completed gift at all.

Corporate Naming - the naming of any facility or program after a corporate or other business-oriented entity.

Current Purpose Gifts - non-endowed gifts to be expended for the purposes designated by the donor.

Deferred Gift Annuity - a charitable gift annuity for which payments to the annuitant(s) begin more than one year after property is transferred to the charity. (See Gift Annuity.)

Endowments Held and Administered by External Trustees - funds administered by a trustee other than the U. T. System

Board of Regents, from which a U. T. institution receives distributions, or from which the institution will receive distributions at a specified time. Examples of such trustees are banks, individuals, or other charitable entities.

Facilities - all physical facilities and buildings.

Prominent Facilities - buildings; athletic facilities; other prominent facilities, such as wings of buildings, major components of buildings, large auditoria, concert halls, atriums, prominent outdoor spaces, and clinics.

Less Prominent Facilities - facilities such as laboratories, classrooms, seminar or meeting rooms, and patient rooms that the Vice Chancellor for External Relations, in consultation with the Executive Vice Chancellor for Academic or Health Affairs, determines are less prominent and therefore not within the category of Prominent Facilities.

Gift Annuity - a charitable giving device by which a donor transfers money or other property to a qualified charity in exchange for guaranteed lifetime payments, the present value of which is less than the amount transferred.

Gift Value - the value of a gift at the time it is made. Gifts are valued in accordance with the provisions of the Internal Revenue Code and regulations thereunder.

Individual Naming - the naming of any facility or program after an individual or noncorporate entity.

Intellectual Property - creations of the mind:  inventions, literary and artistic works, symbols, names, images, and designs used in commerce. Intellectual property includes inventions, patents, trademarks, and copyrights. (More on intellectual property [8].)

Limited Partnerships - a limited partnership is an entity in which one or more persons, with unlimited liability (called General Partners) manage the partnership, while one or more other persons only contribute capital; these latter

partners (called Limited Partners) have no right to participate in the management and operation of the business and assume no liability beyond the capital contributed.

Market Value - the price that an asset would bring in a market of willing buyers and willing sellers, in the ordinary course of trade.

Mineral Interest in Real Property - rights to gas, oil, and other minerals, whether joined to or severed from the surface estate.

Permanent or True Endowment - a fund created with gifts received from a donor with the restriction that the principal is not expendable. The gifts are invested in perpetuity and only the distributions are expended for the purposes designated by the donor.

Permanent University Fund (PUF) - a State endowment fund that was established by the Texas Constitution of 1876, and that supports 18 institutions and six agencies of The University of Texas System and The Texas A&M University System. The PUF consists of 2.1 million acres in West Texas and the portfolio of assets resulting from the investment of mineral royalties generated by the land. Fiduciary responsibility for managing and investing the PUF is constitutionally assigned to the U. T. Board of Regents. (More on PUF [9].)

Personal Property - anything other than real property that is subject to personal ownership (see CASE Reporting Standards and Management Guidelines, 4th edition, 1.2.5, Gifts-in-Kind). Personal property becomes a gift to a U. T. institution when a transfer of ownership has taken place. A written gift agreement signed by the donor(s) is required for gifts of personal property.

Programs - all nonphysical entities.

Prominent Programs - major entities, such as colleges,

164

schools, academic departments, and prominent academic centers, programs, and institutes.

Less Prominent Programs - academic centers, programs, and institutes that the Vice Chancellor for External Relations, in consultation with the Executive Vice Chancellor for Academic or Health Affairs, determines are less prominent and therefore not within the category of Prominent Programs.

Prominent Naming - the naming of prominent facilities or prominent programs.

Quasi-endowment - institution funds functioning as an endowed fund that may be dissolved and returned to the institution with the approval of the U. T. System Board of Regents.

S Corporation - a form of corporation, allowed by the Internal Revenue Service for most companies with 100 or fewer shareholders, none of which can be partnerships, corporations, or nonresident aliens that enables the company to enjoy the benefits of incorporation but be taxed as if it were a partnership. Formerly known as Subchapter S Corporation.

Surface Interest in Real Property - any interest in the surface of real property and improvements, and all other property interests that do not constitute the mineral estate.

Term Endowment - funds for which the donor has stipulated that the principal may be expended after a stated period or on the occurrence of a certain event.

The University of Texas Foundation, Inc. (U. T. Foundation) - a nonprofit corporation established in 1967 to accept and manage gifts in support of U. T. The U. T. System and its institutions are the beneficiaries of the U. T. Foundation, but the Foundation functions independently under its own Board of Directors and pursues its own investment policies in the

management of its portfolios. (More on U. T. Foundation [5].)

The University of Texas Investment Management Company (UTIMCO) - an investment management corporation created in March of 1996 solely for the purpose of managing the investment of assets under the fiduciary care of the U. T. System Board of Regents. The Board controls UTIMCO and appoints all nine members of the UTIMCO Board. (More on UTIMCO [10].)

The University of Texas System Board of Regents - the governing body for The University of Texas System. It is composed of nine members who are appointed by the Governor and confirmed by the Senate. Terms are of six years each and staggered, with the terms of three members expiring on February 1 of odd-numbered years. (More on the Board of Regents [11].)

The University of Texas System Long Term Fund (LTF) - an internal U. T. System pooled investment fund of privately raised endowments and other long-term funds of the 15 institutions of the U. T. System. (More on the Long Term Fund [12].)

The University of Texas System Pooled Income Fund (PIF) - a trust maintained by the U. T. System in accordance with federal tax laws in order to obtain favorable tax treatment for donors to the Fund. It is designed to receive gifts of cash and readily marketable securities, paying the income from pooled gifts to persons designated by the donors during their lives. At the death of the life beneficiary, a proportionate part of the principal of the trust is severed and distributed to the U. T. System or institution as designated by the donor.

Website Solicitations:  Sponsorship Acknowledgments - a logo or identifier with a hypertext link to a person's or entity's website, placed on a U. T. web page to acknowledge the person's or entity's donation of services or products or

financial or research support to U. T. System or to an institution or a college, school, department, unit, center, institute, or program of such institution.

Policy Details

UTS138 [13]

**Responsible Offices:**

External Relations

**Date Approved:**

March 21, 2005

**Dates Amended:**

April 1, 2009

October 6, 2011

October 4, 2012

May 8, 2013

November 11, 2014

bor@utsystem.edu [14]

Related Info

**Relevant System Policies, Procedures, and Regents' Rules:**

Rule 60101: Acceptance and Administration of Gifts [15]

Rule 60103: Guidelines for Acceptance of Gifts of Real Property [16]

Rule 60202: Endowed Academic Positions [17]

Rule 70301: Matters Relating to Real Property [18]

Rule 80103: Solicitation [19]

Rule 80307: Naming Policy [20]

UTS122 Guidelines for Web Site Solicitations [21]

UTS161 Environmental Review for Acquisition of Real Property [22]

**Related Forms:**

Table of Contents [23]

Gift Only [24]

Gift and Pledge Above Minimum Funding [25]

📄Gift and Pledge Below Minimum Funding [26]
📄Newly Created Endowment with Multiple Donors [27]
📄Newly Created Quasi Endowment [28]
📄Newly Created Quasi/Perm Endowment [29]
📄Life Estate Agreement [30]
📄Standard Corporate Naming Gift/License Agreement [31]
📄Corporate Gift Agreement for Naming of a Less Prominent Facility [32]
📄Corporate Gift Agreement for Naming of a Less Prominent Program [33]
📄Gift Agreement for Individual Prominent Facility Naming [34]
📄Website Sponsorship Gift Agreement [35]
📄Acceptance of Gifts Conforming to Policy Matrix [36]

**Relevant Federal and State Statutes:**

Internal Revenue Code of 1986, as amended [37]

Texas Education Code Section 65.36(f) Donations for Professorships and Scholarships [38]

Texas Government Code Chapter 552 Texas Public Information Act [39]

Texas Property Code Chapter 163 Management, Investment, and Expenditure of Institutional Funds [40]

<div class="terms"><ul class="links inline"><li class="taxonomy_term_16 first last"><a href="http://www.utsystem.edu/offices/external-relations/all" rel="tag" title="">External Relations</a> <span class="print-footnote">[41]</span></li> </ul></div>

**Links:**
[1] http://www.utsystem.edu/policy/forms/uts138/TableofContents.docx
[2] http://www.utsystem.edu/board-of-regents/rules/60101-acceptance-and-administration-gifts
[3] http://www.utsystem.edu/reo
[4] http://www.utsystem.edu/board-of-regents/rules/60202-endowed-

academic-positions

[5] http://www.utexasfoundation.org/

[6] http://www.utsystem.edu/board-of-regents/rules/80307-naming-policy

[7] http://www.utsystem.edu/board-of-regents/rules/80103-solicitation

[8] http://www.utsystem.edu/ogc/IntellectualProperty/homepage.htm

[9] http://www.utimco.org/scripts/internet/fundsdetail.asp?fnd=2

[10] http://www.utimco.org/scripts/internet/index.asp

[11] http://www.utsystem.edu/board-of-regents

[12] http://www.utimco.org/scripts/internet/fundsdetail.asp?fnd=4

[13] http://www.utsystem.edu/sites/utsfiles/policies/uts/uts138.pdf

[14] mailto:bor@utsystem.edu

[15] http://www.utsystem.edu/board-of-regents/rules/60101-acceptance-and-administration-gifts

[16] http://www.utsystem.edu/board-of-regents/rules/60103-guidelines-acceptance-gifts-real-property

[17] http://www.utsystem.edu/board-of-regents/rules/60202-endowed-academic-positions

[18] http://www.utsystem.edu/board-of-regents/rules/70301-matters-relating-real-property

[19] http://www.utsystem.edu/board-of-regents/rules/80103-solicitation

[20] http://www.utsystem.edu/board-of-regents/rules/80307-naming-policy

[21] http://www.utsystem.edu/board-of-regents/policy-library/policies/uts122-guidelines-web-site-solicitations

[22] http://www.utsystem.edu/board-of-regents/policy-library/policies/uts161-environmental-review-acquisition-real-property

[23] http://www.utsystem.edu/sites/utsfiles/policies/uts/related-forms/tableofcontents.docx

[24] http://www.utsystem.edu/sites/utsfiles/policies/uts/related-forms/giftonly.docx

[25] http://www.utsystem.edu/sites/utsfiles/policies/uts/related-forms/giftandpledgeaboveminimumfunding.docx

[26] http://www.utsystem.edu/sites/utsfiles/policies/uts/related-forms/giftandpledgebelowminimumfunding.docx

[27] http://www.utsystem.edu/sites/utsfiles/policies/uts/related-forms/multipledonors.docx

[28] http://www.utsystem.edu/sites/utsfiles/policies/uts/related-forms/quasi.docx

[29] http://www.utsystem.edu/sites/utsfiles/policies/uts/related-forms/quasiperm.docx

[30] http://www.utsystem.edu/sites/utsfiles/policies/uts/related-forms/lifeestateagreement.docx

[31] http://www.utsystem.edu/sites/utsfiles/policies/uts/related-forms/corporategiftagmt.docx

[32] http://www.utsystem.edu/sites/utsfiles/policies/uts/related-forms/corporategiftagreementforcorporatenamingsoflessprominentfacilities.docx

[33] http://www.utsystem.edu/sites/utsfiles/policies/uts/related-forms/corporategiftagreementforcorporatenamingsoflessprominentprog.docx

[34] http://www.utsystem.edu/sites/utsfiles/policies/uts/related-forms/indpromfacilitynamingfinalsamplegiftagr.docx

[35] http://www.utsystem.edu/sites/utsfiles/policies/uts/related-forms/websitesponsorshipcorpgiftagr.docx

[36] http://www.utsystem.edu/sites/utsfiles/policies/uts/related-forms/matrixofacceptanceofconforminggifts.docx

[37] https://www.law.cornell.edu/uscode/text/26

[38] http://www.statutes.legis.state.tx.us/Docs/ED/htm/ED.65.htm#65.36

[39] http://www.statutes.legis.state.tx.us/Docs/GV/htm/GV.552.htm

[40] http://www.statutes.legis.state.tx.us/Docs/PR/htm/PR.163.htm

[41] http://www.utsystem.edu/offices/external-relations/all